**In re RaeJean BONHAM, aka Jean Bonham, aka Jeannie Bonham, dba World Plus, Debtor.**

**Bankruptcy No. F95–00897–HAR.**

United States Bankruptcy Court, D. Alaska.

April 10, 1998.

RaeJean Bonham, Fairbanks, AK, Debtor, Pro se.

Cabot Christianson, Gary Spraker, Bundy & Christianson, Anchorage, AK, James De-Witt, for trustee.

Larry D. Compton, Anchorage, AK, trustee.

John Burns, David G. Parry, Birch, Horton, Bittner & Cherot, Fairbanks, AK, Rebecca Copeland, Koval & Featherly, Anchorage, AK, for Joint Defense Committee.

Brad E. Ambarian, Lane, Powell, Spears, Lubersky, Anchorage, AK, Grant E. Court-ney, Lane, Powell, Spears, Lubersky, Seattle, WA, Ronald Goss, Shulkin Hutton, Inc., Seattle, WA, for Various Defendants.

Gerald K. Smith, Randolph J. Haines, Lewis & Roca, Phoenix, AZ, for Defendants.

Kenneth Wooten, Fairbanks, AK, Creditor, Pro se.

## MEMORANDUM DECISION FOR ALLOWANCE OF SUBSTANTIVE CONSOLIDATION

HERBERT A. ROSS, Bankruptcy Judge.

### Table of Contents

| | | Page |
|---|---|---|
| 1. | *INTRODUCTION* | 59 |
| 2. | *FACTS* | 60 |
| | 2.1. *Procedural Background* | 60 |
| | 2.2. *Background Of World Plus and World Plus, Inc.* | 61 |
| | 2.3. *Background of Atlantic Pacific Funding Corp.* | 61 |
| | 2.4. *Business of Selling Airline Tickets Procured With Frequent Flyer Miles* | 63 |
| | 2.5. *Delta Air Lines Suit* | 66 |
| | 2.6. *Investment Contract Business (The Ponzi Scheme)* | 66 |
| | 2.7. *Relationships Between World Plus, Inc. and Atlantic Pacific Funding Corp.* | 66 |
| | 2.8. *Bank Accounts* | 67 |
| | 2.9. *The State of Alaska Securities Investigation* | 69 |
| | 2.10. *The State of Idaho Securities Investigation* | 71 |
| | 2.11. *Transfers For Personal Benefit* | 72 |
| | 2.12. *Benefits vs. Burdens of Consolidation; Reliance of the Investors on WPI or APFC* | 73 |
| 3. | *ISSUES* | 75 |
| 4. | *LEGAL ANALYSIS* | 75 |
| | 4.1. *A Bankruptcy Court Has Authority to Order Substantive Consolidation of Entities (Usually All of Them Debtors) in an Appropriate Case* | 75 |
| | 4.2. *Substantive Consolidation Should be Distinguished from State Law Alter Ego Remedies* | 76 |
| | 4.3. *Early Development of the Case Law of Substantive Consolidation* | 77 |
| | Fish v. East | 78 |
| | Sampsell v. Imperial Paper & Color Corp | 78 |
| | Stone v. Eacho | 79 |
| | Soviero v. Franklin National Bank | 79 |
| | Chemical Bank New York Trust Co. v. Kheel | 79 |
| | Flora Mir Candy Corp. v. R.S. Dickson & Co. | 80 |
| | In re Gulfco Investment Corporation | 80 |
| | 4.4. *Substantive Consolidation Cases Under The Bankruptcy Code* | 81 |
| | In re Vecco Construction Industries, Inc. | 81 |
| | In re Snider Bros., Inc. | 81 |
| | Augie/Restivo Baking Co., Ltd. | 82 |
| | Eastgroup Properties v Southern Motel Assoc., Ltd. | 82 |
| | 4.5. *Substantive Consolidation of Non–Debtors Under the Bankruptcy Code* | 83 |
| | In re 1438 Meridian Place, N.W., Inc. | 84 |
| | In re Crabtree | 85 |

Table of Contents ` Page

In re Tureaud ............................................... 85
Matter of Baker & Getty Financial Services, Inc. ........................ 85
In re Munford, Inc. ........................................... 86
In re United Stairs Corp. ...................................... 87
Matter of New Center Hospital ................................... 88
In re Creditors Services Corp. ................................... 89
In re Alpha & Omega Realty, Inc. ................................ 90
In re R.H.N. Realty Corp. ...................................... 91
In re Julien Co. .............................................. 91
In re Lease–A–Fleet, Inc. ...................................... 92
4.6. *Motion is Appropriate to Determine the Substantive Consolidation Issue* ...... 93
4.7. *Application of Law to Determine If WPI and APFC Should be Substantively Consolidated With the RaeJean Bonham Case* ...................... 95
4.8. *Should the Consolidation be Nunc Pro Tunc to Original Filing Date?* ...... 98
In re Auto–Train Corp. ........................................ 98
Baker & Getty Financial Services, Inc. ............................. 100
Matter of Evans Temple Church- .................................. 100
In re Kroh Brothers Development Co. ............................... 101

5. *CONCLUSION* .................................................. 102

---

1. *INTRODUCTION*—Larry Compton, the chapter 7 trustee, filed a motion to consolidate the estate of the individual debtor, RaeJean Bonham, with the estates of two non-debtors, World Plus, Inc. (WPI) and Atlantic Pacific Funding Corp. (APFC), two corporations closely held by Bonham.

The trustee asks that consolidation be effective as of December 19, 1995, the date that the involuntary bankruptcy proceeding was commenced against Ms. Bonham. The trustee seeks to fix that date for avoidance proceedings with respect to any transfers made by Bonham, WPI, and·APFC.

There are no assets in these estates of significant value, except the avoidance recoveries. Ms. Bonham operated a Ponzi scheme through investment contracts issued in the name of WPI and APFC in the four or five years before December 19, 1995. If consolidation is not permitted, the creditors of Bonham, WPI and APFC, totaling over $50 million dollars in claims filed in this bankruptcy (the largest percentage coming from losses related to the investment contracts) will recover nothing.

There has been vigorous opposition to consolidation from the targets of the avoidance actions filed by the trustee. Appendix A is a table setting out the voluminous pleadings on this issue.

The trustee has filed over 600 adversary proceedings seeking avoidance of payments by WPI and APFC to investment contract participants. If the consolidation is denied, most or all of these avoidance actions will fail and the creditors will receive nothing.

Whether or not to allow substantive consolidation is generally a fact-driven decision. For that reason, the facts the court relies on are extensively set forth in Part 2 of this *Memorandum Decision*. The case law uniformly holds that substantive consolidation should be sparingly used, with an eye to possible negative effects on creditors. Yet, there are cases where substantive consolidation is justly applied.

The bar is set even higher with respect to the substantive consolidation of non-debtors. Nonetheless, this is an appropriate case to invoke the doctrine. In balancing the interests of the parties, I find that they favor granting the substantive consolidation of the WPI and APFC estates with the estate of RaeJean Bonham.

The procedure to raise the issue has been fair. The effective date of the substantive

consolidation of this case with the estates of WPI and APFC shall be December 19, 1995.

### 2. FACTS[1]—

#### 2.1. Procedural Background—

2.1.1. On December 19, 1995, an involuntary chapter 7 petition was filed by various creditors against RaeJean Bonham, aka Jean Bonham, aka Jeannie Bonham, dba World Plus.

2.1.2. On December 20, 1995, a hearing was held on the motion of the petitioning creditors to appoint an interim trustee. Larry Compton was appointed the interim trustee during this involuntary chapter 7 proceeding. [See, Order, Docket Entry 5].

2.1.3. The debtor, RaeJean Bonham, initially contested the involuntary chapter 7. However, at a hearing on January 8, 1996, she agreed to the petition and the appointment of a chapter 11 trustee, and converted the case to chapter 11. On January 9, 1996, the court entered an Order For Relief And Voluntarily Conversion To A Chapter 11 Case (Docket Entry 38, filed January 9, 1996).

2.1.4. RaeJean Bonham filed a voluntary chapter 11 petition on January 5, 1996, Case No. F96–00013–HAR, listing as debtors herself, APFC, and WPI. The petition states in Bonham's handwriting: "This is an individual filing—these are names of corporations in which debtor was a former shareholder. RSB." No activity had taken place in that case, and no schedules, statements or lists had been filed. At the hearing on January 8, 1996, the court indicated that it would dismiss the voluntary case, F96–00013–HAR, and an Order Dismissing Voluntary Petition was entered (Docket Entry 5, filed January 9, 1996). There was no notice to interested parties of the intent to dismiss, except to those appearing at the hearing.

2.1.5. The chapter 11 trustee, Larry Compton, investigated the operations of the debtor-in-possession, and concluded that he could not continue the business. Among other things, the purported business (selling tickets procured with frequent flyer mileage, which the debtor or her related companies purchased from third parties) appeared to conflict with an injunction that had been entered against RaeJean Bonham and World Plus, Inc. in the United States District Court for the Northern District of Georgia, Delta Air Lines, Inc. v. Robert Y. Seward, et al., Case No. 93–CV–1036–HTW. The debtor acquired funds with the promise of exorbitant interest rates for the alleged purpose of purchasing frequent flyer mileage to conduct the ticket sales business. The trustee shortly concluded that the ticket sales business was a front for a Ponzi investment scheme. After hearing testimony on January 29, 1996, the court converted the chapter 11 case to chapter 7 (Docket Entry 147, filed January 30, 1996). Larry Compton was appointed chapter 7 trustee (Docket Entry 143, filed January 29, 1996).

2.1.6. There have been approximately 1,111 proofs of claim filed for over $53 million. Most of these claims, to the exclusion of the Delta Air Lines settlement (Docket Entry 1364, filed August 26, 1997), and a handful of others, arise from the investment operations of the debtor or her related corporations, WPI or APFC.

2.1.7. Minimal net proceeds are expected from the liquidation of personal assets of the

---

1. I have largely adopted the findings of fact proposed by the trustee. I am aware of the caution that a trial court should not blindly rubber stamp the findings proposed by the prevailing party. Hagans v. Andrus, 651 F.2d 622, 626 (9th Cir. 1981), cert den 454 U.S. 859, 102 S.Ct. 313, 70 L.Ed.2d 157. In this case, however, the facts involve a great deal of financial analysis and the inferences that are drawn from them. These are not easily stated in general terms. Accordingly, I have adapted and used the trustee's proposed findings which sets this material out extensively.

Before doing so, I have checked the record for accuracy. See, Photo Electronics Corp. v. England, 581 F.2d 772, 776–777 (9th Cir.1978).

I have reviewed the parties' evidentiary submissions, and I have sat through the involuntary trial and many other proceedings involving RaeJean Bonham. I believe the trustee's proposed findings fairly state the facts.

Because the issue of substantive consolidation is so fact intensive, I have set the facts forth in Part 2 of this Memorandum Decision extensively.

debtor. Therefore, there are virtually no assets in this case except the potentiality of the trustee recovering on fraudulent transfers or preference actions. The trustee has commenced approximately 613 adversary proceedings to recover fraudulent and preferential transfers from investors of the debtor, WPI or APFC.

2.2. *Background Of World Plus and World Plus, Inc.*—

2.2.1. RaeJean Bonham operated a proprietorship known as "World Plus" before April 1991. The stated purpose of the business was to purchase frequent flyer miles available from various airlines and use them to acquire tickets, which she then sold to the public. Sometime prior to 1989, World Plus began issuing short term investment contracts for returns of 50% within 60 to 90 working days. World Plus later offered investment contracts returning 50% for 6 to 8 months, and contracts for 20% over 6 months. Beginning in June 1995, World Plus began issuing contracts for 50% interest for periods as short as 10 days. (*See, Affidavit of Larry D. Compton* [*"Compton Affidavit"*], Exhibit 35).

2.2.2. RaeJean Bonham incorporated World Plus, Inc. (WPI) on April 22, 1991. (*See, Compton Affidavit,* Exhibit 8).

2.2.3. Bonham was the incorporator of WPI, its registered agent and sole director. The only other officer of WPI was Bonham's husband, Steve Bonham, who was listed as vice president. (*See, Compton Affidavit,* Exhibit 9). Steve Bonham denies he was significantly involved in the affairs of WPI, and claims that his wife, RaeJean, ran the business.

2.2.4. RaeJean Bonham is the sole shareholder of WPI, but WPI never issued stock certificates or recorded ownership in any stock register for WPI.

2.2.5. There is no evidence of WPI holding any shareholder meetings, and there are no minutes of director meetings.

2.2.6. WPI never filed any income tax returns with the Internal Revenue Service or the State of Alaska.

2.2.7. There are no financial statements for WPI. Larry Compton is a licensed certified public accountant and panel trustee in Alaska. As such, he has a great deal of forensic accounting experience in investigating the financial records of debtors and testing them for fraud. In this case, Mr. Compton, after diligent inquiries, has been unable to locate income statements, balance sheets, cash journals, and the normal accounting records one would expect in a business that handled as much cash as debtor, WPI, and APFC.

2.2.8. WPI was involuntarily dissolved by the State of Alaska on September 18, 1995. (*See, Compton Affidavit,* Exhibit 10).

2.3. *Background of Atlantic Pacific Funding Corp.*—

2.3.1. RaeJean Bonham began to issue investment contracts under the name of APFC in the fall of 1992. The bulk of APFC investment contracts were issued in 1993 and 1994. These investment contracts were purportedly for the purpose of purchasing frequent flyer miles from third parties for resale through her ostensible business. The first investment contract by APFC, which the trustee has located to date, was issued on October 30, 1992, to Jack C. Melior for 50% return in 6 months. (*See, Compton Affidavit,* Exhibit 36).

2.3.2. When Ms. Bonham first began to issue investment contracts under the name of APFC, she does not appear to have been shareholder, officer, director, or otherwise an agent of APFC, a Nevada corporation. Her husband, Steve, denies he had any significant role in the operation of APFC, and claims that his wife, RaeJean, ran the business.

2.3.3. On September 21, 1992, Irma D. Butler, a customer service coordinator for Laughlin Associates, Inc., incorporated APFC in Nevada.

2.3.4. On February 19, 1993, Bonham signed a Nevada Headquarters Program or Contract Office Service Package with Laugh-

lin Associates to provide corporate services and a Nevada base. (*See, Compton Affidavit,* Exhibit 13). As part of the corporate profile of APFC, Bonham instructed Laughlin to take daily phone messages, stating that Bonham was currently "out of the office" and inform Bonham of the phone calls so she could return them from her Fairbanks office. Bonham also completed a Mail Forwarding Service Agreement and Application For Delivery of Mail Through Agent, instructing Laughlin to forward her mail to a Fairbanks post office box. On this agreement, Bonham described APFC's business as "travel." (*See, Compton Affidavit,* Exhibit 14).

2.3.5. On February 24, 1993, Bonham opened Account No. 25101940 in the name of RaeJean S. Bonham, dba Atlantic Pacific Funding Corporation, with First National Bank of Anchorage (the FNBA Account). The initial deposit was a check in the amount of $5,000 drawn on WPI's Key Bank Account No. 125200879. (*See, Compton Affidavit,* Exhibit 12).

2.3.6. On March 19, 1993, Bonham signed an Application for Business License for Carson City, Nevada on behalf of APFC. Rae-Jean Bonham is shown as the president, and the nature of business is noted as "travel." (*See, Compton Affidavit,* Exhibit 15).

2.3.7. On March 22, 1993, George Johnson signed a bill of sale on APFC letterhead acknowledging receipt of $1,000 from APFC for payment "in full for the purchase of this corporation from RaeJean Bonham." (*See, Compton Affidavit,* Exhibit 16).

2.3.8. On May 6, 1993, Carson City, Nevada issued a business license effective through December 31, 1993. The licensee was stated as: "Bonham, RaeJean S. Atlantic Pacific Funding, Inc." (*See, Compton Affidavit,* Exhibit 17).

2.3.9. On or about September 15, 1993, the State of Nevada requested a List of Officers, Directors, and Agent for APFC. Laughlin Associates, Inc. is shown as the corporation's duly appointed resident agent. Charles Ferrara was listed as the president, secretary, and treasurer of APFC. (*See, Compton Affidavit,* Exhibit 18).

2.3.10. On October 1, 1993, Bonham signed a Consent to Action Without a Meeting of the Shareholders of Atlantic Pacific Funding, Inc., by which Charles Ferrara was removed as director and she was named director of APFC. Bonham used preprinted forms supplied by Laughlin Associates. The accompanying Acceptance of Office is signed by Bonham and dated February 14, 1994. (*See, Compton Affidavit,* Exhibit 21).

2.3.11. In February 1994, Bonham completed a subsequent List of Officers, Directors, and Agent, identifying herself as the president, secretary, treasurer, and sole director of APFC. (*See, Compton Affidavit,* Exhibit 19). Bonham submitted another List of Officers, Directors, and Agent for APFC in August 1994, identifying herself as president, secretary and treasurer, but did not disclose the directors of the corporation. The address of the corporation is that of Laughlin Associates at 2533 N. Carson, # 1185, Carson City, NV 89706. (*See, Compton Affidavit,* Exhibit 20).

2.3.12. The debtor's files also contain Minutes of Annual Meeting of Board of Directors of APFC, and Minutes of Annual Meeting of Stockholders of APFC, both reflecting that they were held on September 24, 1994. (*See, Compton Affidavit,* Exhibit 22).

2.3.13. No stock certificates appear to have been issued or logged onto a stock ledger reflecting Bonham's ownership of the stock of APFC.

2.3.14. The trustee has located no documentation regarding capitalization of the corporation or its asset base.

2.3.15. APFC never filed an income tax return with the IRS or the State of Alaska.

2.3.16. No financial statements for APFC have been located despite the trustee's diligent search and requests for production of information and records from RaeJean Bonham.

2.3.17. APFC never registered to do business in Alaska.

2.3.18. Bonham sent a letter dated February 9, 1994, on APFC letterhead to WPI and APFC investors. This letter stated that WPI and APFC were registered only in the states of Alaska and Nevada. She admonished her investors not to tell anyone, including financial institutions, about her investment program. (*See, Compton Affidavit,* Exhibit 23). Some of the investors have denied seeing this letter.

2.3.19. APFC had no employees.

2.3.20. APFC had no business other than the issuance of investment contracts, collecting invested funds, and paying investors of APFC and WPI. APFC was no longer a viable Nevada corporation after October 1, 1995. (*See, Compton Affidavit,* Exhibit 71).

2.4. *Business of Selling Airline Tickets Procured With Frequent Flyer Miles—*

2.4.1. WPI and World Plus, the proprietorship operated by RaeJean Bonham prior to the incorporation of WPI, sold frequent flyer tickets to the general public. RaeJean Bonham testified in various proceedings before this court that she purchased large blocks of frequent flyer miles from large corporations, some of them Fortune 500 corporations. The trustee, Larry Compton, has found no proof of such purchases, and no inventory of miles. There are no records regarding the procurement and disposition of any such miles. The court finds that Bonham's testimony in this respect was false.

2.4.2. Bonham appears to have purchased some frequent flyer miles from various brokerage firms dealing in frequent flyer mileage. After making an airline reservation, an employee of WPI would receive payment from the customer and would order a frequent flyer ticket from a broker. The broker would procure the ticket from an individual frequent flyer member. The broker would take 50% of the ticket price at the time of the order, and receive the balance upon delivery of the ticket.

2.4.3. Since 1991, the largest part of WPI tickets were with Delta Air Lines and, in 1994, Bonham estimated that 90% of the reservations were placed with Delta Air Lines.

2.4.4. The trustee has located limited records purporting to detail the sales of frequent flyer tickets for 1991, 1992 and 1994 (including January 1995). This information included the sales price of each ticket and the cost of the ticket recorded on a monthly basis. The trustee has not found similar information for any other year. The debtor's records show that in 1991 and 1992, World Plus/WPI sold approximately 100 tickets a month, but by 1994, the number had fallen to approximately 50 tickets per month with a gross profit of approximately $5,000—$6,000 per month. The sales of tickets for this period, according to the debtor's records, were as follows:

### 1991

| Date—1991 | No. of Tickets | Amount Sold | Cost of Goods | Gross Profit | Profit per Ticket |
|---|---|---|---|---|---|
| January 1991 | 120 | $64,830 | $55,660 | $9,170 | $76 |
| February 1991 | 75 | $43,872 | $36,100 | $7,772 | $105 |
| March 1991 | 146 | $83,520 | $68,600 | $14,920 | $102 |
| April 1991 | 65 | $35,002 | $30,415 | $4,587 | $71 |

| Date—1991 | No. of Tickets | Amount Sold | Cost of Goods | Gross Profit | Profit per Ticket |
|---|---|---|---|---|---|
| May 1991 | 67 | $36,270 | $37,706 | ($1,436) | $0 |
| June 1991 | 136 | $70,920 | $61,825 | $9,095 | $67 |
| July 1991 | 80 | $39,829 | $35,655 | $4,174 | $52 |
| August 1991 | 91 | $49,815 | $41,100 | $8,715 | $96 |
| September 1991 | 48 | $27,974 | $22,295 | $5,679 | $118 |
| October 1991 | 69 | $39,255 | $31,055 | $8,200 | $119 |
| November 1991 | 112 | $59,808 | $50,712 | $9,096 | $81 |
| December 1991 | 245 | $129,900 | $110,710 | $19,190 | $78 |
| *TOTAL* | 1254 | $680,995 | $581,833 | $99,162 | $79 |

## 1992

| Date – 1992 | No. of Tickets | Amount Sold | Cost of Goods | Gross Profit | Profit per Ticket |
|---|---|---|---|---|---|
| January 1992 | 113 | $63,976 | $53,289 | $10,687 | $95 |
| February 1992 | 71 | $39,819 | $32,030 | $7,789 | $110 |
| March 1992 | 92 | $50,805 | $42,250 | $8,555 | $93 |
| April 1992 | 114 | $61,889 | $53,205 | $8,684 | $76 |
| May 1992 | 74 | $40,502 | $34,280 | $6,222 | $84 |
| June 1992 | 153 | $78,023 | $67,335 | $10,688 | $70 |
| July 1992 | 147 | $78,310 | $67,305 | $11,005 | $75 |
| August 1992 | 123 | $64,452 | $55,879 | $8,573 | $70 |
| September 1992 | 76 | $40,405 | $34,746 | $5,659 | $75 |
| October 1992 | 93 | $50,395 | $41,750 | $8,645 | $93 |
| November 1992 | 148 | $77,055 | $66,938 | $10,117 | $68 |
| December 1992 | 271 | $141,045 | $121,623 | $19,422 | $72 |
| *TOTAL* | 1,475 | $786,676 | $670,630 | $116,046 | $79 |

1994

| Date – 1994 (incl.01/95) | No. of Tickets | Amount Sold | Cost of Goods | Gross Profit | Profit per Ticket |
|---|---|---|---|---|---|
| January 1994 | 48 | $26,320 | $21,290 | $5,030 | $105 |
| February 1994 | 41 | $24,168 | $18,810 | $5,358 | $131 |
| March 1994 | 50 | $34,870 | $28,307 | $6,563 | $131 |
| April 1994 | 23 | $32,140 | $25,790 | $6,350 | $233 |
| May 1994 | 45 | $25,295 | $21,030 | $4,265 | $95 |
| June 1994 | 129 | $65,615 | $53,595 | $12,020 | $93 |
| July 1994 | 94 | $53,094 | $44,280 | $8,814 | $94 |
| August 1994 | 82 | $46,615 | $38,755 | $7,860 | $96 |
| September 1994 | 57 | $32,640 | $26,720 | $5,920 | $104 |
| October 1994 | 52 | $31,100 | $25,820 | $5,280 | $102 |
| November 1994 | 51 | $28,847 | $24,484 | $4,363 | $86 |
| December 1994 | 95 | $53,240 | $48,678 | $4,562 | $48 |
| January 1995 | 17 | $9,590 | $8,388 | $1,202 | $71 |
| *TOTAL* | 784 | $463,533 | $385,947 | $77,586 | $99 |

*(See,* Exhibit 33 to the *Compton Affidavit, Docket Entry 732,* and Exhibit 84 to the *Supplemental Affidavit of Larry D. Compton [Supplemental Affidavit], Docket Entry 1281).*

2.4.5. The gross profit figures shown in ¶ 2.4.4, are prior to the deduction of overhead expenses such as rent, employee salaries, insurance, etc.

2.4.6. Other than the ticket information described in ¶ 2.4.4, the investor information described in ¶ 2.7.3, and check registers, there are no ledgers, financial statements, or accounting information for Bonham, World Plus, WPI, or APFC. In addition, the debtor has not cooperated with the trustee's investigation and her answers to the trustee's questions have been inconsistent, evasive, and not credible. She has frustrated the trustee's efforts to reconstruct her business activities. The trustee has attempted to reconstruct the debtor's financial records based on the canceled checks issued by World Plus, WPI, and APFC, and the monthly bank statements for those entities obtained from the relevant financial institutions under subpoena, or from federal agencies that have subpoenaed the debtor's records. Using available check registers, trustee's counsel has created a Quicken database detailing the debtor's deposits, payments, and transfers to the extent possible. The database has substantially complete deposit and payment detail for non-cash items for the years 1990 and 1992–1995.

2.4.7. The trustee has attempted to analyze all cash deposits which he located in the records of debtor, WPI and APFC, and has identified approximately $2.4 million of such deposits. Even assuming that these are all ticket revenues and were added to the gross profits shown in ¶ 2.4.4, there would probably have been a profit in 1992 and 1995, but still a loss in 1990, 1993, and 1994.

2.4.8. The ticket sales business did not generate sufficient revenue to cover the debt service on the investment contracts. That debt service was covered by procuring subsequent investment contracts, the proceeds of which were used to pay the obligations on prior investment contracts.

2.5. *Delta Air Lines Suit*—A complaint was filed in *Delta Air Lines, Inc. v. Robert Y. Seward, et al.,* Case No. 93–CV–1036–HTW, in the United States District Court for the Northern District of Georgia in early May 1993. On May 13, 1993, the Georgia District Court entered a preliminary injunction prohibiting the defendant ticket suppliers from selling frequent flyer tickets on Delta Air Lines. An amended complaint was filed on September 13, 1993, adding WPI, RaeJean Bonham, Steven Bonham, and other defendants. That complaint alleged, among other things, that Bonham's ticket brokering defrauded Delta and tortiously interfered with Delta's business relations. On or about January 30, 1995, the Georgia District Court granted Delta's motion for partial summary judgment determining Bonham's and the other defendants' liability to Delta. On September 29, 1995, the Georgia District Court entered a permanent injunction prohibiting the defendant ticket suppliers from selling fre-

quent flyer tickets on Delta Air Lines to, among others, World Plus.

2.6. *Investment Contract Business (The Ponzi Scheme)*—

2.6.1. Throughout Ms. Bonham's operation of the business, as an individual, as WPI, and as APFC, investment contracts were offered to investors with very high rates of return for relatively short periods. For example, a number of the contracts were for 50% return on investments within 60 to 90 days, although they varied to as low as 20% to 50% for a period of 6 to 8 months.

2.6.2. As the investment business got in trouble due to the pyramid nature of its capital needs, WPI offered as high as 50% on a contract for as short as 10 days.

2.6.3. Bonham, WPI, and APFC dealt with investors who were located in 42 separate states. These 1,000 + investors had over 6,000 investment contracts, of which over 2,000 separate contracts were issued in 1995.

2.6.4. The trustee's investigation has shown that WPI and APFC (and perhaps to a small extent, Bonham, as a sole proprietor in 1991) had the following investment contract obligations outstanding at the end of each calendar year:

| Year | Contract Obligations as of 12/31 | Number of Contracts as of 12/31 | Number of Tickets Needed to Sell at $550 per ticket |
|------|------|------|------|
| 1991 | $1,447,500 | 109 | 2,631 |
| 1992 | $1,330,000 | 85 | 2,418 |
| 1993 | $21,440,000 | 1030 | 38,981 |
| 1994 | $25,637,000 | 1263 | 46,612 |
| 1995 | $22,363,468 | 1144 | 40,660 |

(*See, Supplemental Affidavit,* Exhibit 88). Assuming a ticket was sold to a buyer for $550 per ticket, all of which was applied to revenue, the last column indicates how many tickets would have been required to be sold to cover the principal amount of the contracts issued, without even considering the exorbitant interest promised. Bonham and the

corporations' actual ticket activity, as reflected in ¶ 2.4.4, was not even close to the actual number of tickets needed.

2.7. *Relationships Between World Plus, Inc. and Atlantic Pacific Funding Corp.*—

2.7.1. The trustee has determined that WPI routinely transferred investment funds

to APFC. For the years ending December 31, 1993, 1994, and 1995, WPI directly transferred the following amounts to APFC's FNBA account:

| Payor | Payee | Period | Amount |
|-------|-------|--------|--------|
| WPI | Atlantic Pacific | 2/23/93–12/31/93 | $197,000 |
| WPI | Atlantic Pacific | 1/1/94–12/31/94 | $1,436,500 |
| WPI | Atlantic Pacific | 1/1/95–12/31/95 | $2,200,000 |
| *TOTAL* | | | $3,833,500 |

(*See, Compton Affidavit,* Exhibit 37).

2.7.2. Bonham did not formally notify investors who had dealt with her individually, that she had incorporated WPI in April 1991, and that they were now investing in a corporation that had never been capitalized. Thus, investors with contracts issued by World Plus prior to April 1991, held contracts against a sole proprietorship. Yet, if they rolled the contract over after April 1991, the new contract was with a new entity, WPI.

2.7.3. The overwhelming majority of the investors with multiple investments after 1992, indiscriminately received contracts from both WPI and APFC. Bonham never made any distinction as to which entity would issue the investment contract. The sole records of investments maintained by Bonham were index cards on the individual investor. Even those index cards do not reference which entity issued which contract. (*See, Supplemental Affidavit,* Exhibit 103).

2.7.4. Nor did the fact that an investor paid money to WPI ensure that WPI would issue the investment contract (or that payment to APFC would result in an investment contract from APFC). To further complicate matters, on maturity APFC often paid the obligations of WPI, and if the investor rolled all or part of the investment contract into a new contract, it was not necessarily issued by the same corporation.

2.8. *Bank Accounts—*

2.8.1. Bonham, WPI and APFC held and operated several bank accounts for the years 1989–1995. The trustee has discovered the following accounts:

| Bank Name and Account Number | Key Bank Account No. 075019140 | Key Bank Account No. 07001307100 | First Natl Bank of Anch. Acct No. 2510 194 0 | Merrill Lynch CMA Account No. 28H–07015 | Denali State Bank Account No. 102–8281 |
|---|---|---|---|---|---|
| Name on Account (per bank statement) | Steve or RaeJean Bonham | World Plus until 6/91; thereafter, World Plus, Inc. | Until 11/93: RaeJean Bonham, dba Atlantic Pacific Funding Corp.<br><br>After 11/93: Atlantic Pacific Funding Corp.<br><br>[bank statements for all years sent to Fairbanks address] | World Plus, Inc. | World Plus, Inc., dba Atlantic Pacific Funding, Inc. |
| Account name on checks | Steve or RaeJean Bonham, dba S & S Services | World Plus until 12/91; thereafter, World Plus, Inc. | Atlantic Pacific Funding Corp. [until 11/93: Fairbanks address; thereafter, Nevada address] | World Plus, Inc., dba Atlantic Pacific | World Plus, Inc. |
| Date Opened | 12/8/87 | 1/11/88 | 2/26/93 | 10/4/95 | 8/9/95 |
| Date Closed | 11/95 | 8/10/95 | 10/20/95 | 12/29/95 | 10/9/95 |

2.8.2. The checks used for WPI's Key Bank Account No. 07001307100, show that the account was originally a business account in the name of "World Plus—RaeJean Bonham." (*See, Compton Affidavit,* Exhibit 82).

2.8.3. Bonham opened Account No. 2510 194 0 at First National Bank of Anchorage on February 26, 1993, in the name of RaeJean Bonham, dba Atlantic Pacific Funding Corporation. Bonham opened the account with a $5,000 deposit from WPI. At the time Bonham opened the FNBA account, APFC operated as the "dba" of RaeJean Bonham, and was funded in large part by investments payable to WPI. In November 1993, the bank statements were changed to read "Atlantic Pacific Funding Corporation."

2.8.4. The trustee's investigation indicates that the debtor's records show that WPI transferred approximately $3.8 million to APFC. These records also reflect over $700,000 in transfers from APFC to WPI. There are no records setting forth the relationship between the corporations. There are no records reflecting or recording the transfer of funds between the corporations, or giving any basis for the transfers. (*See, Compton Affidavit,* Exhibit 37).

2.8.5. Bonham directly and frequently deposited funds from WPI investments into APFC's bank account. Bonham would take checks made payable to WPI and endorse the check for deposit in APFC's FNBA account. Other times, Bonham would simply line out "WPI" as payee and write "Atlantic Pacific." (*See, Compton Affidavit,* Exhibits 38 and 40).

2.8.6. By at least March 1995, Bonham had created deposit stamps that read:

FOR DEPOSIT ONLY
ATLANTIC PACIFIC FUNDING CORP.
DBA ATLANTIC PACIFIC CORP.,
WORLD PLUS, INC.

FOR DEPOSIT ONLY
ATLANTIC PACIFIC FUNDING CORP.
DBA ATLANTIC PACIFIC FUNDING
WORLD PLUS

(*See, Compton Affidavit,* Exhibit 41).

2.8.7. In August 1995, Bonham opened Account No. 102–8281 with Denali State Bank. The name on the account according to the bank statements was "WORLD PLUS INC DBA ATLANTIC PACIFIC FUNDING." Investment checks were endorsed with a deposit stamp that read: "WORLD PLUS INC. dba ATLANTIC PACIFIC FUNDING." (*See, Compton Affidavit,* Exhibits 42 and 43).

2.8.8. In October 1995, Bonham opened a cash management account in Juneau with Merrill Lynch Pierce Fenner & Smith, Account No. 28H–07015. Bonham requested that the account be set up as "WORLD PLUS INC. DBA ATLANTIC PACIFIC FUNDING CORP." Merrill Lynch refused and required Bonham to choose one name or the other. Bonham opened the account in the name of WPI. However, her checks on the account still read: "WORLD PLUS INC. DBA ATLANTIC PACIFIC FUNDING CORP." (*See, Compton Affidavit,* Exhibits 44 and 45).

2.8.9. Bonham also began to deposit investment funds into the joint account with her husband Steve Bonham, Key Bank Account No. 075019140. In the months of September and October 1995, Bonham deposited a total of $502,185 into this account. For the two months prior to September, she had deposited a total of $10,088.91. The money did not stay in the account for long, as by the end of October 1995, the account had a negative balance of $3,651.64.

| Key Bank Account No. 075019140 | July 1995 | August 1995 | September 1995 | October 1995 |
|---|---|---|---|---|
| Deposits | $1,379.91 | $8,709.00 | $193,108.05 | $309,076.95 |
| Withdrawals | $0.00 | $0.00 | $56,000.00 | $42,025.00 |
| Checks Paid | $479.76 | $8,321.45 | $135,029.99 | $270,703.59 |
| Deposits less Withdrawals and Checks Paid | $900.15 | $387.55 | $2,078.01 | ($3,651.64) |

(*See, Compton Affidavit*, Exhibit 46).

2.8.10. At about the same time, Bonham began to transfer investment income from one investor directly to another investor in satisfaction of a prior investment contract. Bonham would endorse the check to another investor or add his or her name as an additional payee. To date, the trustee has discovered approximately 10 lateral transfers in the amount of $20,000. (*See, Compton Affidavit*, Exhibit 70).

2.8.11. At the time of the petition date, the only account that was still open was the Cash Management Account with Merrill Lynch Pierce Fenner & Smith.

2.8.12. The debtor's use of WPI and APFC bank accounts as well as her own in such an indiscriminate and arbitrary fashion, has completely intermingled and confused the true financial receipts and disbursements of each entity. Given the debtor's lack of cooperation and apparent untrustworthy testimony in various proceedings before this court, it is unlikely that the trustee could ever, at any reasonable cost, sort out the true nature of the financial operations and structure of the three parties (Bonham, WPI, and APFC). The debtor has not only been untruthful in this court, but in previous securities investigations by the State of Idaho and the State of Alaska.

2.9. *The State of Alaska Securities Investigation—*

2.9.1. On September 4, 1992, Ed Watkins, Alaska Securities Examiner, spoke to RaeJean Bonham who told him that she had no idea the investment contracts might be a security. Bonham represented to Watkins that there would be no new investment sales and no rollovers would occur until the matter was resolved. (*See, Compton Affidavit*, Exhibit 47).

2.9.2. Despite her assurances to the State of Alaska, Bonham continued to issue investment contracts. Counsel for the trustee has identified over 90 additional investment contracts signed with WPI during the period of the State of Alaska's investigation, September 1992—March 1993.

2.9.3. Bonham wrote a letter to the "Investors of World Plus, Inc." dated September 28, 1992. Specifically, Bonham informed her investors:

It has come to my attention once again that a few investors have been violating the understood agreement that this a confidential program and is not to be discussed with anyone. It is extremely important to observe this rule in the program and not give out any information to family members, friends or financial institutions.

(*See, Compton Affidavit*, Exhibit 49). Some investors deny receiving this letter.

2.9.4. On November 17, 1992, Richard Hompesch, WPI's Alaska counsel, wrote to Ed Watkins about the WPI investigation, enclosing a list of active investors showing the date they first became involved and total invested. (*See, Compton Affidavit*, Exhibit 50).

2.9.5. Hompesch wrote Watkins on February 9, 1993, about the WPI investments in response to Watkins' stated concerns over the investment program. In his letter, Hompesch enclosed a list of investors and the investment balances. (*See, Compton Affidavit,* Exhibit 51).

2.9.6. Hompesch wrote another letter to Watkins on February 26, 1993, in which he attached a revised list of investors showing 17 contracts coming due in March 1993, for a total of $280,000. (*See, Compton Affidavit,* Exhibit 53). Hompesch also provided a schedule of contracts that had been paid since September 1992, which indicated $285,-000 had been paid to 21 investors.

2.9.7. In March 1993, Hompesch submitted to the Alaska Department of Commerce & Economic Development (the DCED), WPI's application to offer exempt securities. (*See, Compton Affidavit,* Exhibit 54). In his letter, Hompesch stated that all of the outstanding contracts would be paid on or before March 12, 1993. *Id.* In reality, WPI and APFC, who had just begun issuing investment contracts, had over $2 million in outstanding contracts as of March 31, 1993. (*See, Supplemental Affidavit,* Exhibit 89).

2.9.8. Hompesch stated: "Assuming that all prior sales have been resolved to your satisfaction and that all investors are paid in full, World Plus, Inc. would like to begin selling new contracts on March 15, 1993, totaling approximately $300,000." (*See, Compton Affidavit,* Exhibit 54). Hompesch enclosed a *Notice of Exempt Offering* for WPI to raise up to $500,000 through contracts bearing 20% interest which would be limited to no more than 25 Alaska residents. *Id.*

2.9.9. On May 24, 1994, Hompesch wrote to Lawrence Carroll, Senior Securities Examiner for the State of Alaska DCED, to renew the *Notice of Exempt Offering,* and stated that there were no outstanding investment contracts. (*See, Supplemental Affidavit,* Exhibit 90).

2.9.10. Attached to the letter is Bonham's affidavit stating that "[a]t this time, World Plus, Inc. and Atlantic Pacific Funding Corporation have paid in full all contracts previously issued by the corporations. At this time, there are no outstanding or unpaid contracts to any investors." *Id.* This affidavit was incorrect. In fact, during the period from March 15, 1993, through May 24, 1994, WPI and APFC issued over 2,000 investment contracts in the principal amount of $45,710,-000. (*See, Supplemental Affidavit,* Exhibit 91). A review of Exhibit 91 demonstrates that many of the investment contracts for this period were issued by APFC in an effort to circumvent the State of Alaska's registration requirements.

2.9.11. The DCED renewed WPI's exempt status to permit it to issue investment contracts at 20% per annum, to 15 or fewer Alaska residents, the total investment not to exceed $250,000. However, the DCED did require WPI to report the status of its investments every three months.

2.9.12. On September 8, 1994, Hompesch disclosed $220,000 in investments with 14 investors. (*See, Supplemental Affidavit,* Exhibit 93). Additionally, Hompesch informed the DCED that APFC had issued no new investment contracts. In reality, for the period of June 10, 1994, through September 8, 1994, WPI and APFC issued over 500 new investment contracts having a face amount of $11,765,000. (*See, Supplemental Affidavit,* Exhibit 94).

2.9.13. On December 12, 1994, Hompesch made his second disclosure to the DCED concerning the status of WPI's and APFC's investment program. (*See, Supplemental Affidavit,* Exhibit 95). Hompesch wrote that the only new investor since the September report was Ray Patterson, and that the only other change was a reduction in Arlyss Borjesson's investment from $15,000 to $5,000. Again, Hompesch stated that APFC "sold no contracts."

2.9.14. In fact, during this period WPI and APFC issued over 600 new contracts totaling $14,254,000 in principal, according to the debtor's records. (*See, Supplemental Affidavit,* Exhibit 96).

2.9.15. In his report for the first quarter of 1995, Hompesch informed the DCED that "neither Alaska Pacific Funding nor World Plus, Inc. has made any sales nor has had

any investment change since our last report on December 12, 1994." (*See, Supplemental Affidavit,* Exhibit 97).

2.9.16. However, since December 12, 1994, WPI and APFC had, in fact, issued over 650 new contracts worth $14,458,000 in principal. (*See, Supplemental Affidavit,* Exhibit 98).

2.9.17. On June 14, 1995, Hompesch again informed the DCED that neither WPI nor APFC had made any new investments, and that no changes had occurred since the March 1995, report. (*See, Supplemental Affidavit,* Exhibit 99).

2.9.18. Actually, during this period WPI issued over 800 new investment contracts with a principal value of $16,177,000. (*See, Supplemental Affidavit,* Exhibit 100).

2.9.19. On September 13, 1995, Hompesch filed his last report with the DCED detailing 11 investors with $18,000 invested with WPI. (*See, Supplemental Affidavit,* Exhibit 101).

2.9.20. That report was also materially deceptive, as from June 15, 1995, through September 13, 1995, WPI issued over 750 contracts totaling $15,636,231 in principal. (*See, Supplemental Affidavit,* Exhibit 102). Some of these contracts were for two to three months. These contracts did not state the interest rate on the face of the contract, but did state the total amount due from WPI upon maturity. The trustee has calculated that the investment contracts maturing in two to three months returned 50% interest.

2.9.21. Through a series of falsehoods, directly and through her attorney, Bonham intentionally mislead the State of Alaska for over three years, during which time she issued tens of millions of dollars in investment contracts. Bonham used WPI and APFC to perpetuate her fraud, and these single-owner corporations should not be recognized as valid entities in order to shelter them, or their owner, from liability.

2.10. *The State of Idaho Securities Investigation—*

2.10.1. On November 17, 1993, James Burns, Securities Investigator, Idaho Department of Finance, wrote to RaeJean Bonham requesting information regarding solicitation of investments in Idaho. (*See, Compton Affi-*

*davit,* Exhibit 56). Bonham responded to the request for information on December 21, 1993, on APFC letterhead with a Nevada address, sending names of Idaho investors in WPI and APFC. (*See, Compton Affidavit,* Exhibit 57). She explained her business as buying large blocks of frequent flyer miles. She also explained that all lenders were Alaska residents when they first invested, but some later moved to Idaho. *Id.* The investors she identified were: Robert Beeson (c/o Chuck Joy), John Davidson, Howard Hall, Sherman Hart (c/o John Hart), Betty Jordan, Al Knapp, Donna Kreiensieck, and Niki LeClair. Bonham convinced her Idaho investors to write letters of support for APFC. (*See, Compton Affidavit,* Exhibit 58).

2.10.2. On January 20, 1994, Bonham, on APFC letterhead, responded to Burns' request for information on the investment contracts. She again stated that she never solicited investments in Idaho. Rather, according to her, people contacted her to invest, to see if there was an "open slot." To explain her business, she wrote:

> Atlantic Pacific Funding Corporation is my company I use to buy blocks of airline miles from large corporations at a cheaper price and WPI is my travel company which sells airline tickets to the public. We sell those tickets at a much higher price than what we purchased them for, enabling us to pay the interest to my investors.

(*See, Compton Affidavit,* Exhibit 59).

2.10.3 James Burns wrote to Bonham on February 3, 1994, informing her that the Nevada Corporations Department records showed someone else as the president, secretary and treasurer. (*See, Compton Affidavit,* Exhibit 60).

2.10.4. On February 16, 1994, Cumer Green, Bonham's Idaho counsel, wrote to James Burns, enclosing a recent filing in Nevada to revise the officers and directors to show Bonham as the president, treasurer, and secretary, as well as sole shareholder. The only other officer was Steve Bonham, her husband. Green explained that there was an oversight and Bonham's omission from the biennial report was just a house-

keeping item that needed to be done. (*See, Compton Affidavit,* Exhibit 61).

2.10.5. Approximately a week later, Ed Watkins, Alaska DCED, wrote to Bonham's Alaska counsel, Daniel Winfree, of Winfree & Hompesch, to inform Bonham that WPI's exemption from registration for WPI would not be renewed unless the Idaho securities investigation was resolved. (*See, Compton Affidavit,* Exhibit 62).

2.10.6. The State of Idaho concluded its investigation on April 5, 1994, when the Idaho Securities Bureau (Department of Finance) issued its *Agreement and Order* against RaeJean Bonham, WPI and APFC regarding the sales of unregistered securities by unlicensed sales persons and disclosure violations per the settlement agreement. (*See, Compton Affidavit,* Exhibit 73).

2.10.7. As part of the *Agreement and Order,* Bonham on behalf of herself personally, WPI, and APFC promised not to offer or issue any new investment contracts to Idaho residents unless she qualified the securities with the Idaho Department of Finance. *Id.* at ¶ 4. Bonham also promised to pay $2,500 as a fine to the State of Idaho.

2.10.8. After the conclusion of the Idaho investigation, Hompesch wrote to Lawrence Carroll regarding WPI's *Notice of Exempt Offering.* (*See, Compton Affidavit,* Exhibit 63). Hompesch enclosed a proposed *Notice of Exempt Offering,* a copy of the *Agreement and Order* of the Idaho investigation, and an affidavit from Bonham stating that all outstanding investors had been paid in full and there were no outstanding contracts. *Id.* Lawrence P. Carroll responded to Hompesch's letter on June 6, 1994. (*See, Compton Affidavit,* Exhibit 64). Under the agreement for WPI and APFC to offer exempt securities, WPI and APFC were required to file a report on September 15, 1994, and every three months thereafter. Additionally, Carroll wrote, *Id.*:

> Please understand that we are concerned that the limitations imposed by the Statutes are observed, and that there be no commingling of funds from other entities or other jurisdictions.

Please note, as well, that the exemption at AS 45.55.140(b)(5)(B) is limited to Alaska residents only.

2.10.9. Hompesch acknowledged and accepted the State of Alaska's conditions by letter on June 16, 1994. (*See, Compton Affidavit,* Exhibit 65). Again, this did not deter Bonham, as she continued to bring in new investors through both APFC and WPI.

2.10.10. Bonham, through either WPI or APFC, issued approximately 80 investment contracts to Idaho residents after the *Agreement and Order.* (*See, Supplemental Affidavit,* Exhibit 92). Neither she, WPI, nor APFC ever paid the $2,500 fine.

2.10.11. Through another separate series of falsehoods, directly and through counsel, Bonham lied and defrauded the State of Idaho, all the while continuing her Ponzi scheme. Bonham used WPI and APFC to perpetuate this fraud and these single-owner corporations should not be recognized as valid entities in order to shelter them, or their owner, from liability.

2.11. *Transfers For Personal Benefit—*

2.11.1. Through various individual adversary proceedings during the course of this bankruptcy, the court has determined that RaeJean Bonham has used proceeds from WPI to finance her personal credit cards, housing, food, travel, and entertainment. Although WPI was a Sub S corporation, there is no indication that RaeJean Bonham properly accounted for withdrawals from WPI as salary or dividends, but rather used the corporation to pay her personal expenses.

2.11.2. The trustee has established in other proceedings that WPI or World Plus transferred approximately $200,000 to S & S Services, the proprietorship of RaeJean Bonham's husband, Steven Bonham. (*See, Compton Affidavit,* Exhibit 66 at ¶ 37).

2.11.3. The trustee has also established by his affidavit and in other proceedings before this court the following direct payments to Bonham's personal creditors by World Plus or WPI:

| Date | Amount | Item |
|---|---|---|
| Since January, 1990 | $11,652.60 | GMAC – Automobile payments |
| Since January, 1990 | $6,573.67 | Saupe Enterprises – Heating Oil |
| Since January, 1990 | $8,306.07 | GVEA – Utility bills |
| Since January, 1990 | $24,651.00 | Mortgage payments on the Bonham's personal residence |
| | $26,843.00 | Life insurance premiums for policies on the lives of Steve & RaeJean Bonham |
| **TOTAL** | **$78,026.34** | |

(*See, Compton Affidavit,* Exhibit 66 at ¶¶ 40–44)

2.11.4. World Plus or WPI made the following payments to purchase personal goods or equipment for RaeJean or Steve Bonham or on their behalf:

| Date | Ck # | Amount | Payee | Item |
|---|---|---|---|---|
| Sept. 7, 1990 | 2723 | $24,000.00 | Mike Gutman | Case 580D Backhoe |
| June 3, 1991 | 3530 | $19,000.00 | WJR, Ltd. | Case 580D Backhoe |
| Feb. 19, 1992 | 4556 | $7,000.00 | Gail McQuade | 1992 Harley Davidson motorcycle |
| Jan. 14, 1993 | 5548 | $3,000.00 | Craig Taylor Equip. Co. | Melroe 853 Bobcat Loader |
| Jan. 18, 1993 | 5563 | $22,130.00 | Craig Taylor Equip. Co. | Melroe 853 Bobcat Loader |
| Dec. 14, 1994 | 7262 | $15,408.45 | Farthest North Harley Davidson | 1995 Harley Davidson Motorcycle |
| **TOTAL** | | **$90,538.45** | | |

(*See, Compton Affidavit,* Exhibit 66 at ¶¶ 10–29).

2.11.5. World Plus purchased or supplied money for the partial purchase price of motor vehicles for Bonham's children, Stephanie and Steven Shane Bonham. WPI paid monthly stipends to Stephanie Bonham while she attended college. World Plus occasionally paid Stephanie's rent and tuition, and paid for vacations. (*See, Compton Affidavit,* Exhibit 66).

2.12. *Benefits vs. Burdens of Consolidation; Reliance of the Investors on WPI or APFC—*

2.12.1. Investors in World Plus, WPI and APFC have claims against RaeJean Bonham for unpaid amounts due under the investment contracts, given her violations of Alaska and federal laws regulating the sale of securities. APFC appears to have no, or minimal, creditors as it ceased to issue investment contracts in 1994, though Bonham continued to use the corporation to hide investment funds and make payments to WPI investors until the fall of 1995.

2.12.2. WPI and APFC are dissolved and defunct corporations. There are no meaningful assets for the creditors of WPI or APFC to recover outside of bankruptcy. Consolidation will not diminish any recovery by a creditor of WPI or APFC. Nor, will consolidation diminish the recovery of the creditors of RaeJean Bonham, given the lack of corporate independence.

2.12.3. Creditors of the corporations will recover little, or nothing, absent substantive consolidation of WPI and APFC with the Bonham estate *nunc pro tunc* as of December 19, 1995, the date of the involuntary petition against RaeJean Bonham.

2.12.4. The parties objecting to substantive consolidation are all defendants in the adversary proceedings brought by the trustee. They have filed a number of declarations stating that each of them relied on the separate credit of the corporations, WPI and

APFC, and that they did not rely on the credit of RaeJean Bonham. These declarations are identified on the following table:

| Attorney Name | Docket Entries | Notes |
| --- | --- | --- |
| GOERIG, George | 1285–1300 | Declarant states that they *knew* that other investors had contacted state agencies and alleges only dealt with WPI or APFC, and Bonham only as agent. |
| ROSIE, John (*Pro Se*) | 1284 | Alleges only dealt with WPI or APFC, and Bonham only as agent. |
| BURNS, John | 1268, 1275 | Alleges only dealt with WPI or APFC, and Bonham only as agent. |
| MACDONALD, Michael | 1282 | Alleges only dealt with WPI or APFC, and Bonham only as agent. |
| DAVISON, Bruce | 1280 | Alleges only dealt with WPI or APFC, and Bonham only as agent. |
| AMBARIAN, Brad | 1179–1203 1277–1278 | Declarant states that they *knew* that other investors had contacted state agencies and alleges only dealt with WPI or APFC, and Bonham only as agent. |
| COPELAND, Rebecca | 1235–1264 | Alleges only dealt with WPI or APFC, and Bonham only as agent. |

Some of the declarations (e.g., those filed by George Goerig's and Brad Ambarian's clients) indicate that the declarant "knew other investors had contacted the Alaska state agency which regulated securities and that agency had represented that WPI or APFC were in compliance with relevant laws of Alaska, including those governing corporations and the issuance of securities." None of the declarations give any detail about the specific financial information relied on. All are conclusionary, boilerplate statements that the investors relied on WPI and APFC, and only dealt with RaeJean Bonham as agent of the corporation. None had any financial information about WPI and APFC.

2.12.5. Those investors with investments prior to WPI's incorporation on April 22, 1991, held claims against Bonham personally, and their declarations directly contradict their testimony. Even after Bonham began operating though WPI and APFC, she was the only one who dealt or negotiated with investors to sell investment contracts and the only one who issued them either in her own name or on behalf of WPI and APFC.

2.12.6. Declarants also blur the line between WPI and APFC. Given the debtor's indiscriminate use of the corporations, it is impossible to separate the assets and liabilities of Bonham, WPI and APFC. It is implausible to believe that investors relied on the separate credit of one corporation as opposed to the other, given the degree to which the corporations were intertwined and dominated by Bonham.

2.12.7. None of the declarants state that he or she reviewed any financial statement or other accounting before investing. It is uncontroverted that the corporations never is-

sued a financial statement and never filed corporate tax returns.

2.12.8. The declarants do not reference any specific facts in support of their statements that they relied on the separate credit of WPI and APFC. RaeJean Bonham has testified that she personally handled each investment; no other party for WPI and APFC was involved. She used the corporate identities indiscriminately and often interchangeably. The self-serving statements of the investors' personal beliefs are not credible evidence that they relied on the credit of one or the other corporate entities as opposed to RaeJean Bonham.

3. *ISSUES*— The principal issues are:

- Does the bankruptcy court have authority to substantively consolidate the estates of non-debtors?

- Is substantive consolidation with the non-debtor corporations, WPI and APFC, appropriate in this case?

- What is the proper procedure for determining if there should be substantive consolidation with non-debtors? Is an adversary proceeding required? Are separate voluntary petitions required?

- If the cases are substantively consolidated, should it be ordered *nunc pro tunc* to the date of filing the involuntary case against RaeJean Bonham for preference purposes?

4. *LEGAL ANALYSIS*— **Part 4.1** of this *Memorandum Decision* is introductory, spelling out some of the basics.

In **Part 4.2**, I discuss the distinction between the federal bankruptcy concept of substantive consolidation and the state law theories of *alter ego*, corporate veil piercing and reverse piercing.

I have included a long section, about 33 pages in **Parts 4.3, 4.4 and 4.5** of this *Memorandum Decision* to review the case law of substantive consolidation: (a) pre-Code, (b) after the 1978 Bankruptcy Code became effective, and (c) relating specifically to nondebtor consolidation. In these sections, I do not attempt to any great degree to reflect on how these cases relate to the Bonham, WPI and APFC facts.

Rather, in **Part 4.6** (relating to procedure), **Part 4.7** (discussing the merits of substantive consolidation in this case), and **Part 4.8** (discussing the *nunc pro tunc* or effective date issue), I will attempt to relate the law to the specific case before the court.

4.1. *A Bankruptcy Court Has Authority to Order Substantive Consolidation of Entities (Usually All of Them Debtors) in an Appropriate Case-* Substantive consolidation has long been part of the fabric of bankruptcy law. 2 *Collier on Bankruptcy,* ¶ 105.04[2], fn18 (Matthew Bender 15th ed rev 1998):

*Sampsell v. Imperial Paper & Color Corp.,* 313 U.S. 215, 61 S.Ct. 904, 85 L.Ed. 1293 (1941). In *Sampsell,* the Court upheld the bankruptcy referee's consolidation of the estate of the individual debtor with the assets of a nondebtor corporation which was wholly owned by the debtor and his family. In upholding consolidation, the Court noted that the "power of the bankruptcy court to subordinate claims or to adjudicate equities arising out of the relationship between the several creditors is complete." 313 U.S. 215, 219, 61 S.Ct. 904, 907, 85 L.Ed. 1293, 1298.

*Sampsell* involves the merger of the assets and claims of separate estates (including the estate of a non-debtor).

The source of the authority to substantively consolidate has been found in the general equitable powers of the court, now embodied in 11 U.S.C.A. § 105(a). *Sampsell* ; *In re Augie/Restivo Baking Co., Ltd.,* 860 F.2d 515, 518 (2nd Cir.1988); *Matter of Munford,* 115 B.R. 390, 397 (Bankr.N.D.Ga.1990).

■ Thus, in general, there is little doubt that a bankruptcy court has authority to grant substantive consolidation of separate bankruptcy estates into one estate. Also, in what appears to be a slight majority of the cases which have decided the issue, courts have held that the estate of a non-debtor can be consolidated into that of a debtor under the appropriate circumstances.

■ "[Substantive consolidation] involves the pooling of the assets and liabilities of two or more related entities; the liabilities of the entities involved are then satisfied from the common pool of assets created by consolida-

tion." *Eastgroup Properties v. Southern Motel Assoc., Ltd.,* 935 F.2d 245, 248 (11th Cir.1991). There are winners and losers in the process. The creditors of the poorer estates may benefit from the pooling of assets of a more solvent estate, and those from the more financially solvent estates will be diluted. *Flora Mir Candy Corp. v. R.S. Dickson & Co.,* 432 F.2d 1060, 1062–63 (2nd Cir.1970).

■ Substantive consolidation should not be used as a mere device of convenience, e.g., to overcome accounting difficulties, where it would unfairly impair the vested rights of some of the creditors. *In re Augie/Restivo Baking Co., Ltd.,* 860 F.2d 515, 518 (2nd Cir.1988); *Flora Mir Candy Corp.,* 432 F.2d at 1062. Because of the possibility for such inequities, it should be used sparingly. *Chemical Bank New York Trust Co. v. Kheel,* 369 F.2d 845, 847 (2d Cir.1966); *Matter of New Center Hospital,* 187 B.R. 560, 567 (E.D.Mich.1995). In general, a court should be convinced that injustice would occur absent consolidation. *See, In re Snider Bros., Inc.,* 18 B.R. 230, 235 (Bankr.D.Mass.1982), analyzing *Soviero v. Franklin Nat'l Bank,* 328 F.2d 446 (2d Cir.1964).

■ However, the rights of a class of creditors of one of the entities can be protected, even though the cases are substantively consolidated. Not all classes of creditors have to be treated equally. For example, the security interest of a creditor in the assets of one of the entities may be protected so the interest is not diluted (nor improved) by the consolidation. *In re Continental Vending Machine Corp.,* 517 F.2d 997, 1001 (2nd Cir. 1975); *In re Tureaud,* 45 B.R. 658 (Bankr. N.D.Okla.1985), *affd* 59 B.R. 973 (1986).

The only sections of the 1978 Bankruptcy Code which even mention substantive consolidation are 11 U.S.C.A. § 302(b), involving the joint cases of spouses, and § 1123(a)(5)(C), stating that a chapter 11 plan may provide for the consolidation or merger of a debtor with one or more persons.

FRBP 1015(b) allows the court to order joint administration of certain related debtors, but the Advisory Notes make it clear that substantive consolidation is neither authorized or prohibited by the rule. Thus, the doctrine of substantive consolidation has been shaped by the case law as I have outlined in Parts 4.3, 4.4, and 4.5 of this *Memorandum Decision.*

■ After reading many of these cases, I tend to agree with the court that said precedent alone is of limited value because of the diversity of factual patterns. *In re Reider,* 31 F.3d 1102, 1108 (11th Cir.1994). The results in the cases are fact driven.

■ *4.2. Substantive Consolidation Should be Distinguished from State Law Alter Ego Remedies—* The parties opposing substantive consolidation have all been sued by the trustee to recover funds on various avoidance theories. They are defendants in the *Bonham Recovery Actions* (the *BRA* ), the lead case for case management purposes under complex litigation procedures. Among the defenses they have raised is that the trustee is attempting to enforce an *alter ego* remedy which is not a prerogative of the bankruptcy trustee. They argue that the right to pursue this remedy belongs to the individual creditors of WPI and APFC, corporations which RaeJean Bonham used to obtain a large part of the investments she received before she was shut down in late 1995. In other words, they say the trustee has no standing to pursue avoidance claims.

Some of these defendants cite *Williams v. California 1st Bank,* 859 F.2d 664 (9th Cir. 1988), *In re Ozark Restaurant Equipment Co., Inc.,* 816 F.2d 1222 (8th Cir.1987), *cert den* 484 U.S. 848, 108 S.Ct. 147, 98 L.Ed.2d 102 (1987); and *Caplin v. Marine Midland Grace Trust Co.,* 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972), as dispositive because the trustee has no authority to assert a creditor's individual rights against WPI and APFC under Alaska law. They cite *Croxton v. Crowley Maritime Corp.,* 817 P.2d 460, 466 (Alaska 1991), for the proposition that Alaska has rejected reverse piercing of a corporate entity. *See,* Docket Entry 1105, *Supplemental Memorandum in Opposition to Trustee's Motion For Substantive Consolidation Re: Alter Ego Issues* (filed by Randolph Haines for various defendants).

Others make similar arguments. *See,* Docket Entry 1108, *Joinder and Supplement to "Response and Objection to Trustee's Motion for Substantive Consolidation"* (filed by Brad Ambarian for various defendants). They cite *Norman v. Nichiro Gyogyo Kaisha, Ltd.,* 645 P.2d 191, 196 (Alaska 1982); *Arctic Contractors, Inc. v. State of Alaska,* 573 P.2d 1385, 1386 (Alaska 1978); *Martin v. Maldonado,* 572 P.2d 763, 773 (Alaska 1977).

The trustee need not dispute these cases because they do not address the federal bankruptcy law concept of substantive consolidation, and deal only with the state law regarding *alter ego,* piercing and reverse piercing of corporate entities.

The difference between corporate veil piercing and the bankruptcy concept of substantive consolidation is succinctly stated by J. Stephen Gilbert, Note: *Substantive Consolidation in Bankruptcy: A Primer,* 43 Vand L Rev 207, 218 and fn 77–81:

> 2. Misplaced Analogy to Corporate Law
>
> The factors evaluated on a motion for substantive consolidation appear similar to an analysis of piercing the corporate veil. Like piercing the corporate veil, substantive consolidation ignores artificial structures legally defining the consolidated entities. Ultimately, however, such an analogy is misplaced because the corporate law doctrine of limited liability is not involved. Rather, substantive consolidation is more like the corporate law notion of enterprise liability because substantive consolidation does not seek to hold shareholders liable for the acts of their incorporated entity. [FN79] Substantive consolidation more closely resembles the bankruptcy rule of subordination because competition for the consolidated assets is between creditors alone. Thus, substantive consolidation ignores artificial legal structures but looks only to the combined assets of the consolidated entities for satisfaction of all claims against the collective group. [footnotes omitted]

*See, In re Creditors Service Corp.,* 195 B.R. 680, 689 (Bankr.S.D.Ohio 1996); *In re Kroh,* 117 B.R. 499, 501–2 (W.D.Mo.1989) ("The result [the bankruptcy judge] reaches may be close to the practice forbidden in *Ozark*

*Restaurant,* but it is distinctly different."); *In re DRW Property Co. 82,* 54 B.R. 489, 496, fn. 2 (Bankr.N.D.Tex.1985).

The law of substantive consolidation is federal bankruptcy law. In some cases, an *alter ego* analysis is involved in determining if entities should be consolidated. The use of an *alter ego* analysis does not, however, deprive the bankruptcy court of jurisdiction to consider substantive consolidation.

4.3. *Early Development of the Case Law of Substantive Consolidation*— The law of substantive consolidation has been developed over the course of almost 60 years in a number of circuit and lower court cases. In this Part 4.3 of this *Memorandum Decision,* I will discuss some of the pre-Code cases. Many, but not all, of these pre-Code cases involve the consolidation of the estates of entities that were already debtors. Some of the most important ones involve the substantive consolidation of non-debtors.

In Part 4.4, I will review some of the circuit cases and key lower court cases decided after the 1978 Bankruptcy Code.

After that, in Part 4.5, I will focus on the case law under the 1978 Bankruptcy Code involving the consolidation of non-debtor entities with existing bankruptcy debtor estates. These are mostly lower court opinions.

Here is a thumbnail sketch of some of the key concepts which arise from the seminal pre-Code cases. Substantive consolidation was fashioned as a device to combat the commission of fraud upon creditors which might go uncorrected in its absence. *See, e.g., Sampsell v. Imperial Paper,* in which consolidation was used to thwart a non-debtor from walking away with the assets which rightfully should have belonged to a bankrupt corporation, but were obtained through fraudulent transfers by insiders.

Substantive consolidation was also used as a practical device where the identity of assets and liabilities of separate entities were badly intermingled by poorly kept accounting records, disregard of corporate formalities, and sloppy business procedures in general. The accounting cost of untangling these estates

might well eat up the amount available for creditors, so consolidation was a practical way to maximize the recovery for the creditors.

There is, however, a need to balance these worthy goals of overcoming fraud or maximizing the recovery where the entities are hopelessly entangled, so that they do not overshadow or defeat the vested rights of innocent creditors.

Circuit Judge Friendly of the 2nd Circuit took a conservative approach, giving more deference to the secured creditors (or, those with guaranties, for example) than the general body of unsecured creditors, even though the bottom line for the total recovery might be less. This is discussed in the *Kheel* and *Flora Mir Candy Corp.* cases reviewed later in this Part 4.3.

Over time, the circuit courts and some lower courts have developed some tests or guidelines to determine if substantive consolidation is appropriate in a given case. These tests vary slightly, but it is fair to say the decision in a given case is heavily dependent on the facts of the individual case. Some of the tests are discussed in Part 4.4.

Here are the earlier cases. As they are reviewed, many of the facts found in Part 2 concerning RaeJean Bonham, WPI, and APFC should come to mind. It is not difficult to see the application of these cases to *Bonham.*

**Fish v. East**— One of the earliest cases is *Fish v. East,* 114 F.2d 177 (10th Cir.1940). The court approved substantive consolidation of a non-debtor which was an "instrumentality" of the debtor.

The case, like the *Bonham* case, involved the consolidation of a non-debtor. There was a motion to consolidate a wholly owned subsidiary, Tiger Placers Company (Placer), and a related partnership, Blue Ridge Co., with the debtor parent, Royal Tiger Mines Company (Mines).

Although there was a commonality of principals in Mines and Placer, when Mines began having financial difficulties and could not raise funds, the principals bailed out of Mines and transferred assets to Placer and Blue Ridge, also owned by the insiders. The ef-fect was to divert assets from the Mines' creditors in a very manipulative way. The 10th Circuit affirmed consolidation, indicating, *Id.* at 191:

> Corporate entity may be disregarded where not to do so will defeat public convenience, justify wrong or protect fraud. [citations omitted] The board of each company was at all times made up of members of the dominating group of their employees or their attorneys.
>
> . . .

The instrumentality rule here has application. The determination as to whether a subsidiary is an instrumentality is primarily a question of fact and degree. The following determinative circumstances are recognized:

> (1) The parent corporation owns all or majority of the capital stock of the subsidiary. (2) The parent and subsidiary corporations have common directors or officers. (3) The parent corporation finances the subsidiary. (4) The parent corporation subscribes to all the capital stock of the subsidiary or otherwise causes its incorporation. (5) The subsidiary has grossly inadequate capital. (6) The parent corporation pays the salaries or expenses or losses of the subsidiary. (7) The subsidiary has substantially no business except with the parent corporation or no assets except those conveyed to it by the parent corporation. (8) In the papers of the parent corporation, and in the statements of its officers, 'the subsidiary' is referred to as such or as a department or division. (9) The directors or executives of the subsidiary do not act independently in the interest of the subsidiary but take direction from the parent corporation. (10) The formal legal requirements of the subsidiary as a separate and independent corporation are not observed.

***Sampsell v Imperial Paper & Color Corp.***— *See,* discussion in Part 4.2 of this *Memorandum Decision.* In *Sampsell v. Imperial Paper & Color Corp.,* 313 U.S. 215, 61 S.Ct. 904, 85 L.Ed. 1293 (1941), substantive consolidation was approved to circumvent the

debtor's fraudulent transfer of assets to a non-debtor entity held by insiders.

*Stone v. Eacho*— Another earlier case was *Stone v. Eacho*, 127 F.2d 284 (4th Cir. 1942), *reh den* 128 F.2d 16 (4th Cir.1942), *cert den* 317 U.S. 635, 63 S.Ct. 54, 87 L.Ed. 512 (1942). Tip Top Tailors, a New Jersey corporation, was a bankrupt in a Delaware bankruptcy. Its subsidiary, also named Tip Top Tailors, was a bankrupt in a separate Virginia proceeding.

The Delaware trustee sought to consolidate the cases. Both corporations were insolvent. The Virginia corporation was almost completely financed through the parent New Jersey store, which maintained the inventory, did the actual tailoring, and paid the bills. The court found that the subsidiary was not treated as a separate entity and the creditors dealt with the parent and subsidiary as one. The court said, *Id.* at 288:

> It is well settled that courts will not be blinded by corporate forms nor permit them to be used to defeat public convenience, justify wrong or perpetrate fraud, but will look through the forms and behind the corporate entities involved to deal with the situation as justice may require. [citations omitted]

> Not only is this done for the purpose of holding a stockholder or parent corporation for debts created by an insolvent corporate agent or subsidiary which is a mere instrumentality of the stockholder or parent, but also for the purpose of allowing the creditors of the stockholder or parent to reach assets held by such a subsidiary. [citations omitted]

*Soviero v. Franklin National Bank*— *Soviero v. Franklin National Bank of Long Island*, 328 F.2d 446 (2nd Cir.1964), is the first of three important 2nd Circuit cases regarding substantive consolidation.

A bankruptcy trustee of Raphan Carpet Corporation sought the adjudication of assets of thirteen separate corporations, each having "Raphan" in its corporate name. Although the corporations filed separate tax returns and kept separate books, they were done by the same accountants. The corporations were run very loosely. There were no minutes. The principals of the corporations treated them as a consolidated business. All the affiliated corporations issued consolidated financial statements on which they listed their assets without separation.

Though suppliers shipped to affiliated corporations, all the billing was to the bankrupt. The bankrupt paid for advertising, labor, insurance, and other costs. The court said, *Id.* at 448:

> It is difficult to imagine a better example of commingling of assets and functions and of the flagrant disregard of corporate forms than as here demonstrated by the bankrupt. One gains the distinct impression that the bankrupt held up the veils of the fourteen collateral corporations primarily, if not solely, for the benefit of the tax gatherer, but otherwise completely disregarded them. Even Salome's could not have been more diaphanous. On these facts, we are convinced that the claims of individual corporate entities advanced for the Affiliates and Realty are 'without color of merit, and a mere pretense.' [citations omitted]

*Chemical Bank New York Trust Co. v. Kheel*— In *Chemical Bank New York Trust Co. v. Kheel*, 369 F.2d 845 (2nd Cir.1966), a shipping magnate owned a number of corporations engaged in the shipping trade. All were in Chapter X under the Bankruptcy Act. Reorganization was not successful and a reorganization trustee was in the process of liquidation. The trustee sought to consolidate and Chemical Bank opposed the motion.

The corporations were operated very loosely as figureheads for the shipping magnate. No attention was paid to corporate formalities. Funds were transferred back and forth in a very complex pattern, and in a manner which would have been very difficult to trace.

Chemical Bank was trustee for bondholders under a secured indenture. Chemical Bank questioned the referee's decision to order consolidation where it was not shown that Chemical Bank had dealt with all the corporations as a unit. The court said, however, *Id.* at 847:

We find no such limitation on the power of the reorganization court. See *Soviero v. Franklin National Bank of Long Island,* 328 F.2d 446 (2nd Cir.1964); *Stone v. Eacho,* 127 F.2d 284 (4th Cir.), rehearing denied 128 F.2d 16, cert. denied 317 U.S. 635, 63 S.Ct. 54, 87 L.Ed. 512 (1942). While the record in the *Soviero* case indicates that there was evidence that the Bank had dealt with the bankrupt and its affiliates as one, the opinion does not make this a necessary foundation for the result. Moreover, we have here an additional factor not present in *Soviero* or *Stone v. Eacho,* the expense and difficulty amounting to practical impossibility of reconstructing the financial records of the debtors to determine intercorporate claims, liabilities and ownership of assets. The power to consolidate should be used sparingly because of the possibility of unfair treatment of creditors of a corporate debtor who have dealt solely with that debtor without knowledge of its interrelationship with others. Yet in the rare case such as this, where the interrelationships of the group are hopelessly obscured and the time and expense necessary even to attempt to unscramble them so substantial as to threaten the realization of any net assets for all the creditors, equity is not helpless to reach a rough approximation of justice to some rather than deny any to all.

While Circuit Judge Friendly concurred, he criticized the majority's reasoning as focusing too much on the complexities of the accounting at the expense of the rights of individual creditors who might have dealt separately with certain of the corporations. He concurred with the result, however, on the ground that Chemical Bank apparently did not establish such a reliance which he apparently thought was its obligation to prove.

***Flora Mir Candy Corp. v. R.S. Dickson & Co.***— The third landmark 2nd Circuit case is *Flora Mir Candy Corp. v. R.S. Dickson & Co.,* 432 F.2d 1060 (2nd Cir.1970), authored by Judge Friendly. In this case, Judge Friendly's deference to the creditors' reliance on the assets of one of the corporate entities prevailed, notwithstanding a situation where the books and records were extremely difficult to sort out.

Debentures had been issued by Meadors, Inc., six years before it was acquired by an intermediate corporate buyer. Subsequently, Meadors was sold to Flora Mir Candy Corporation, which was engaged in a corporate acquisition program. About 7½ years after the debentures had been issued by Meadors, Flora Mir and related companies, including Meadors, filed for Chapter X1 in the Southern District of New York. Prior to the bankruptcies, however, the Meadors' bondholders had sued several of the Flora Mir companies and Meadors for fraud in a South Carolina court.

The substantive consolidation would have diluted the bondholders' recovery. It would have had the effect of eliminating the intercompany transfers and allowed other creditors to share in any recovery which was rightfully the bondholders.

It was argued in favor of substantive consolidation that it would result in a much quicker arrangement than working through the complexities of an accounting. Although a speedy reorganization might have been desirable, the court held that a quicker or easier arrangement should not be accomplished at the expense of Meadors' debenture holders.

The principal to be derived is that the complexities of untangling the accounting is insufficient reason in some cases to grant substantive consolidation where creditors' vested rights are harmed in the process.

***In re Gulfco Investment Corporation***— Similarly, in *In re Gulfco Investment Corporation,* 593 F.2d 921 (10th Cir.1979), a court was faced with a convoluted corporate structure as shown on an organizational chart at the end of the case. *Id.* at 932. A trial court had ordered consolidation, but the 5th Circuit reversed. The bankruptcy court principally based its decision to grant substantive consolidation on the complex accounting issues and difficulties in evaluating intercompany accounts and determining the assets and liabilities of each corporation. The bankruptcy court found that accounting difficulties were

of such a magnitude that they outweighed any individual equitable problems that might have occurred.

The consolidation in *Gulfco,* however, would have eliminated the security interests of some creditors and also eliminated certain guarantees made by one of the debtor corporations to secure the debt of another debtor corporation. The 5th Circuit held that the trial court had not given enough weight to the rights of the secured claimants and the guarantees. Where the corporation guarantees the debts of a sub or affiliate, a creditor is deprived of multiple recoveries from the various layers of corporations by their consolidation. In the consolidation, the creditor is reduced to one claim. The court held that this should not be done except in compelling circumstances. The circumstances, though severe, were not compelling enough to override the creditors' rights which would have been diluted in the consolidation process.

4.4. *Substantive Consolidation Cases Under The Bankruptcy Code—* After the adoption of the 1978 Bankruptcy Code, the courts have struggled to articulate a test to govern whether to grant substantive consolidation. I will discuss two of the leading circuit court cases and a few of the often cited bankruptcy court cases.

The circuit court cases which attempted to articulate a test to determine if substantive consolidation is appropriate are *In re Augie/Restivo Baking Co., Ltd.,* 84 B.R. 315 (Bkrtcy.E.D.N.Y.1988) from the 2nd Circuit and *Eastgroup Properties v. Southern Motel Assoc., Ltd.* from the 11th Circuit. There are no 9th Circuit cases requiring that a particular test be used. The bankruptcy court cases are *In re Snider* from Massachusetts and *In re Vecco* from Virginia.

**In re Vecco Construction Industries, Inc.—** In *In re Vecco Construction Industries, Inc.,* 4 B.R. 407 (Bankr.E.D.Va.1980), the court attempted to fashion a general test based on the pre-Code cases discussed in part 4.3. The parent and four subsidiaries were engaged in the concrete construction business in different locations and in providing labor for those businesses. Over a year before the bankruptcy, the parent had acquired all the assets of the subs in a *de facto*

consolidation. After filing chapter XI for the parent and chapter 11s for the subsidiaries, the debtors moved to substantively consolidate. The motion was unopposed. The court endorsed the "liberal trend" in allowing consolidations from the widespread use of interrelated corporations operating under the parent's shield for tax and business purposes. *Vecco* at 409.

And, the court came up with a seven-part test to determine if a case should be substantively consolidated, *Vecco* at 410:

First, the degree of difficulty in segregating and ascertaining individual assets and liability. Second, the presence or absence of consolidated financial statements. Third, the profitability of consolidation at a single physical location. Fourth, the commingling of assets and business functions. Fifth, the unity of interests and ownership between the various corporate entities. Sixth, the existence of parent and intercorporate guarantees on loans. Seventh, the transfer of assets without formal observance of corporate formalities.

**In re Snider Bros., Inc.—** In *In re Snider Bros., Inc.,* 18 B.R. 230 (Bankr.D.Mass.1982), the creditors' committees of six integrated, family-run businesses involved in purchasing and slaughtering beef, sought substantive consolidation. Only a secured creditor objected. The separate companies operated in different phases of the beef industry, and kept separate books. They operated from one location. There were intercompany loans and guarantees. The committees sought consolidation so the businesses could be better marketed.

The objecting secured creditor's complaint that it would be diluted by $70,000 was not refuted, but the committees argued that the bank had dealt with the debtors as a unit.

The court denied substantive consolidation. Acknowledging the attempt of some courts, like *Vecco Construction,* to set out a test based on various criteria, the court said, *Id.* at 234:

I find that the only real criterion is … the economic prejudice of continued debtor separateness versus the economic prejudice of consolidation. There is no one set

of elements which, if established, will mandate consolidation in every instance. Moreover, the fact that corporate formalities may have been ignored, or that different debtors are associated in business in some way, does not by itself lead inevitably to the conclusion that it would be equitable to merge otherwise separate estates.

The commingling of assets and flagrant disregard of corporate forms is not, itself, enough to justify consolidation. Rather, it is "the injustice to creditors if consolidation is not permitted." *Id.* at 235. The proponent of consolidation must show the harm which arose from the intermingling or the unity of interest. *Id.* at 238.

Once a proponent has established a case for substantive consolidation, it is still possible to raise a defense that, *Id.* at 238:

> ... there is still the matter of the defense that the benefits of consolidation do not outweigh the harm to be caused to the objector. A creditor who has looked solely to the credit of its debtor and who is certain to suffer more than minimal harm as a result of consolidation may be entitled to denial of a request for consolidation.

Thus, consolidation was denied, even without reference to the objection of the secured creditor. The corporations had not been flagrant in disregarding corporate formality. They kept separate books. Their method of operation was similar to many family-run businesses.

*Augie/Restivo Baking Co., Ltd.*— *In re Augie/Restivo Baking Co., Ltd.*, 860 F.2d 515 (2nd Cir.1988), involved the bankruptcies of several corporations. Before they combined operations, Augie's Baking Company, Ltd. and Restivo Brothers Bakers, Inc. operated separately in different boroughs in New York City. Augie's Baking sold its stock to Restivo and the company adopted the Augie/Restivo name. Augie's Baking had been financed by Union Bank and Restivo was heavily financed by Manufacturers Hanover Trust Company (MHTC). No formal merger had ever taken place. The land that Augie's Baking owned was still in its name. Accounts had not been formally transferred.

After the combination, the new Augie/Restivo operated in its own name and did not use Augie's separate name. After the bankruptcy case was filed, numerous cash collateral orders between Augie/Restivo and MHTC were entered into with a result that all of its prepetition accounts receivable claims had been transferred to priority administrative claims under the cash collateral orders.

Apparently, it was necessary to seek consolidation to confirm a plan because Union Bank objected. It objected on the grounds that a consolidation would have diluted its recovery. The circuit court agreed with Union Bank. It reviewed the 2nd Circuit cases, which are outlined in Part 4.3 of this *Memorandum*. It distilled the cases into the following test, *Augie/Restivo* at 518:

> An examination of those cases, however, reveals that these considerations are merely variants on two critical factors: (i) whether creditors dealt with the entities as a single economic unit and "did not rely on their separate identity in extending credit," or (ii) whether the affairs of the debtors are so entangled that consolidation will benefit all creditors. [citations omitted]

The court found that the affairs were not so entangled that they could not be understood without enormous effort (i.e., not nearly as bad as those in *Chemical Bank New York v. Kheel*), and determined that Union Bank had in fact dealt with Augie's Baking as a separate entity. For that reason, consolidation was denied.

*Eastgroup Properties v. Southern Motel Assoc., Ltd.*— In *Eastgroup Properties v. Southern Motel Assoc., Ltd.*, 935 F.2d 245 (11th Cir.1991), Gainsville P–H Properties (GPH) and Southern Motel Association (SMA) were commonly owed. They filed chapter 11 cases, but were converted to chapter 7 cases. The chapter 7 trustee sought to substantively consolidate them. Eastgroup, a creditor of SMA, objected.

SMA and GPH operated out of the same office, and GPH employees performed services for SMA. They had written agreements about the operation of eleven motel properties, five of which SMA had leased from Eastgroup. GPH paid some of SMA's

obligations and there were intercompany transfers.

On what appears to be rather weak evidence, the bankruptcy court granted the motion for substantive consolidation, to prevent the SMA equity holders from realizing a bankruptcy dividend while the GPH creditors would not be paid. In fact, the mathematics of the SMA and GPH cases indicated that both cases were administratively insolvent, let alone paying prepetition creditors or equity holders.

In *Eastgroup Properties*, the court noted, at 248–49:

> There is, however, a "modern" or "liberal" trend toward allowing substantive consolidation, which has its genesis in the increased judicial recognition of the widespread use of interrelated corporate structures by subsidiary corporations operating under a parent entity's corporate umbrella for tax and business purposes. [footnote omitted]

The 11th Circuit Court then stated the test it would use, adopting a standard set out in *In re Auto–Train Corp.*, 810 F.2d 270, 276 (D.C.Cir.1987). *Eastgroup* said, at 249:

> Under this standard, the proponent of substantive consolidation must show that (1) there is substantial identity between the entities to be consolidated; and (2) consolidation is necessary to avoid some harm or to realize some benefit. When this showing is made, a presumption arises "that creditors have not relied solely on the credit of one of the entities involved." Once the proponent has made this prima facie case for consolidation, the burden shifts to an objecting creditor to show that (1) it has relied on the separate credit of one of the entities to be consolidated; and (2) it will be prejudiced by substantive consolidation. ... Finally, if an objecting creditor has made this showing, "the court may order consolidation only if it determines that the demonstrated benefits of consolidation 'heavily' outweigh the harm." [omitting internal and citations]

4.5. *Substantive Consolidation of Non–Debtors Under the Bankruptcy Code.*— Some of early substantive consolidation cases involved the consolidation of non-debtors. These include *Sampsell v. Imperial Paper & Color Corp.*, 313 U.S. 215, 61 S.Ct. 904, 85 L.Ed. 1293 (1941); *Fish v. East*, 114 F.2d 177 (10th Cir.1940); and *Soviero v. Franklin National Bank of Long Island*, 328 F.2d 446 (2nd Cir.1964).

Since the inception of the 1978 Bankruptcy Code, over a dozen cases have considered the issue of substantively consolidating non-debtors into an existing bankruptcy case. These cases have built on the pre-Code cases described in Part 4.3 and those decided since the 1978 Bankruptcy Code went into effect, such as those described in Part 4.4.

 Most of the non-debtor cases acknowledge that consolidating a non-debtor's estate with the case of an existing debtor is a much more sensitive matter than consolidating existing debtors. If substantive consolidation of existing bankruptcy debtors is to be applied cautiously, even more care should be taken with respect to consolidating non-debtors. *See,* Christopher J. Predko, Note: *Substantive Consolidation Involving Non–Debtors: Conceptual and Jurisdictional Difficulties In Bankruptcy*, 41 *Wayne Law Review*, 1741 (Summer 1995). Nonetheless, there are cases in which substantive consolidation of non-debtors is the appropriate procedure and/or remedy under the given facts.

A few of the cases discuss the procedural anachronisms which may arise (e.g., how to give notice to the non-debtor's creditors of the procedure and when is the "order for relief?").

Some of the cases discuss whether the equitable powers of a bankruptcy court under 11 U.S.C.A. § 105(a) stretch so far as to permit substantive consolidation of non-debtors. There is discussion in some cases whether substantively consolidating non-debtors subverts the involuntary bankruptcy provisions of 11 U.S.C.A. § 303.

Here is a sample of the non-debtor cases: Cases *allowing* substantive consolidation of non-debtors are:

- *In re 1438 Meridian Place, N.W., Inc.*, 15 B.R. 89 (Bankr.D.C.1981)
- *In re Crabtree*, 39 B.R. 718 (Bankr. E.D.Tenn.1984)

- *In re Tureaud*, 45 B.R. 658 (Bankr. N.D.Okla.1985), *affd* 59 B.R. 973 (1986)
- *Matter of Baker & Getty Financial Services, Inc.*, 78 B.R. 139 (Bankr. N.D.Ohio 1987)
- *In re Munford, Inc.*, 115 B.R. 390 (Bankr.N.D.Ga.1990)
- *Matter of New Center Hospital*, 187 B.R. 560 (E.D.Mich.1995)
- *In re United Stairs Corp.*, 176 B.R. 359 (Bankr.D.N.J.1995)
- *In re Creditors Service Corp.*, 195 B.R. 680 (Bankr.S.D.Ohio 1996)

Cases *not allowing* substantive consolidation of non-debtors are:

- *In re Alpha & Omega Realty, Inc.*, 36 B.R. 416 (Bankr.D.Idaho 1984)
- *In re DRW Property Co. 82*, 54 B.R. 489 (Bankr.N.D.Tex.1985)
- *In re R.H.N. Realty Corp.*, 84 B.R. 356 (Bankr.S.D.N.Y.1988)
- *In re Julien Co.*, 120 B.R. 930 (Bankr. W.D.Tenn.1990)
- *In re Lease–A–Fleet*, 141 B.R. 869 (Bankr.E.D.Pa.1992)
- *In re Circle Land and Cattle Corp.*, 213 B.R. 870, 877 (Bankr.D.Kan.1997)

*In re 1438 Meridian Place, N.W., Inc.*— In *In re 1438 Meridian Place, N.W., Inc.*, 15 B.R. 89 (Bankr.D.C.1981), the court had a contested matter before it in which creditors sought to substantively consolidate the debtor's estate with other non-debtor corporations and the non-debtor individuals who owned the corporations. Nick and Miranda Rangoussis owned about eight corporations in the Washington, DC area. Each corporation operated a separate rental property. After various tenants obtained a $34,000 judgment against one of the corporations, it filed chapter 11. The tenants then sought to bring in the other corporations as well as the Rangoussises individually. Much like the trustee in *Bonham*, the creditors in *Meridian* sought to disregard the corporate veil and amend the caption to include the non-debtor entities.

The individual corporations, although they each operated separate properties, used a common bank account for income and ex-penses. The account paid the personal bills of the Rangoussises also. The accounting records were in such disarray that, although these were separate rental properties, there were no accounting records or way to identify the income and expenses of each separate property. Most of the corporate formalities had been disregarded.

On the basis of this record, the court found that substantive consolidation was appropriate. In doing this, the court addressed two arguments against consolidation raised by the debtor and non-debtor targets. First, they argued that the issue should be addressed in an adversary proceeding under the former FRBP 701. Secondly, they said that to bring them into the bankruptcy arena, the movants should have proceeded by way of an involuntary petition pursuant to 11 U.S.C.A. § 303.

The court did not read the requirements of the former FRBP 701 as requiring an adversary proceeding. Nor, was an involuntary petition necessary, although it would have been an appropriate way to proceed. The burden of proof was on the creditors seeking to bring in the non-debtor entities, but here they had established the right by showing: (a) a failure to observe corporate formalities; (b) absence of relevant corporate financial records; (c) under-capitalization; (d) principal officers dominating all the corporations; and, (e) commingling of funds.

With respect to the contention that the only appropriate procedure would have been involuntary protection under 11 U.S.C.A. § 303, the court said, *Id.* at 95:

This assertion misses the mark completely. The tenant creditors are in fact creditors of only 1438 Meridian Place, N.W., and they could not comply with the mandated requirements of 11 U.S.C.A. § 303(b) . . .

The creditors in the *Bonham* bankruptcy argue that trustee Compton should have promptly filed *voluntary* petitions for WPI and APFC. This disregards the chaotic state of the records, and the difficulty in getting information from RaeJean Bonham. It was only after an enormous forensic accounting effort that the trustee could see the forest for the trees.

*In re Crabtree*— In *In re Crabtree*, 39 B.R. 718 (Bankr.E.D.Tenn.1984), creditors sought to have a corporation added to the caption of an individual case and its assets consolidated in the individual case. This was based on an *alter ego* claim. In this case, the individual debtor was the sole shareholder of West Knoxville Investment Company, Inc. (WKIC), the non-debtor corporation. No creditors objected to the motion.

The court found that WKIC was the *alter ego* of Crabtree because he was the sole shareholder, guaranteed the corporation's debts, the corporation operated with little formality, and the financial affairs of Crabtree and the corporation were financially intermingled. The corporation acted as a shell nominee for procuring loans for Crabtree's investment schemes. "The affairs of Crabtree and West Knoxville Investment Company, Inc., are so intermingled and entwined that their separate assets and liabilities cannot be ascertained, and any attempt to separate their financial affairs would consume substantial assets of the estate with no considerable likelihood that such an exercise would be successful." *Id.* at 721.

The court held that it would amend the caption of the case to add WKIC *nunc pro tunc* as of July 14, 1983 (apparently the date of filing the involuntary petition). The court said: "The amended petition does not add a second debtor to this case, but rather reflects the reality that West Knoxville Investment Company, Inc. is simply Crabtree's *alter ego* and an instrumentality used by him to conduct his financial affairs." *Id.* at 721. Likewise, the court approved the use of a motion to accomplish this, citing *In re 1438 Meridian Place, N.W., Inc.* and *In re Auto–Train Corp.* (the bankruptcy case which was later affirmed at *In re Auto–Train Corp.*, 810 F.2d 270 (D.C.Cir.1987)).

*In re Tureaud*— The next case in which the court approved substantive consolidation of a non-debtor is *In re Tureaud*, 45 B.R. 658 (Bankr.N.D.Okla.1985). This matter was also commenced by motion for substantive consolidation, as opposed to an adversary. This time, the motion was brought by the chapter 11 trustee. The court held that substantive consolidation would simplify and facilitate the administration of the assets and liabilities of the various entities. No secured creditor would be harmed because security interests were not being eliminated, nor was the status of secured creditors being changed. Regarding the court's power to consolidate, it said at 662: "Under its general equitable powers, 11 U.S.C.A. § 105(a), a bankruptcy court may substantively consolidate affiliate corporations within a pending case when the assets and liabilities of different entities are dealt with as if the assets were held by, and the liabilities were incurred by a single entity." In support of this conclusion, the court discussed *Sampsell, Fish v. East,* and *Matter of Gulfco.*

*Matter of Baker & Getty Financial Services, Inc.*— A case which bears some similarity to the facts of the *Bonham* case, is *Matter of Baker & Getty Financial Services, Inc.*, 78 B.R. 139 (Bankr.N.D.Ohio 1987). In that case, Philip Cordek caused three corporations to be formed; Baker & Getty Financial Services, Inc., Baker & Getty Diversified, Inc., and Baker & Getty Securities, Inc. None of them were actually licensed to be broker dealers, however. Nonetheless, the three corporations engaged in a Ponzi scheme to obtain investments on the promise of quick turnovers.

Involuntary chapter 7 cases were brought against the three corporations, who did not contest. The creditors filed a motion to substantively consolidate the three cases with the non-debtors, Philip and Suzan Cordek. The Cordeks did not oppose.

Cordek had freely used the assets of the debtors for his own purposes before the bankruptcy petitions were filed. The court explained, *Id.* at 140–141:

> There were five bank accounts which were used by CORDEK for business and personal matters. Three of the accounts were opened in the name of "BAKER & GETTY DIVERSIFIED". Two of the accounts were personal accounts of CORDEK. On numerous occasions, corporate funds were used for personal matters. For example, corporate funds were used by CORDEK to: (1) purchase automobiles; (2) repay his educational loans; (3) purchase a boat which was eventually titled in his wife's

name; (4) buy furniture, jewelry and other personalty; (5) pay for a home located near Cleveland, Ohio, and improvements to that home; and (6) pay for hotel rooms for guests attending his wedding. Conversely, personal funds were used to satisfy corporate obligations. [reference to exhibits omitted] CORDEK testified at a hearing on this Motion that the bank accounts were used interchangeably.

The only objection was First National Bank of Barnesville. The bank had loaned over $1 million to a Byron Rice, a regular business customer, to allow him to make a loan with Cordek to purchase various investments, which were to have been sold in a short time at supposed profit.

The bank was aware that Cordek was associated with Baker & Getty, but assumed that the matter was a personal one rather than the business of Baker & Getty. The bank was satisfied with Rice's assets as security for the loan because of its long business relationship with Rice, but nonetheless required Cordek to be a signatory on the note.

Within 90 days of the involuntary petitions, the bank had received $200,000 in payment from Cordek and the perfection of a security interest in certain of the Cordeks' property. The bank was the only one to oppose consolidation of the Cordeks' estates as of the date of the involuntary filings, because their payments were received within 90 days and might have been considered preferential under 11 U.S.C.A. § 547.

The court had no problem finding that this was an appropriate case for substantive consolidation. It determined it must consider the bank's rights as the Cordeks' personal creditor against the interests of other creditors. Most of the major creditors of Cordek were also creditors of the corporate debtors.

The court explained its reasoning, *Id.* at 142–143:

> However, according to uncontroverted testimony, the Bank relied wholly on Mr. Rice's assets and reputation and not on Mr. Cordek's assets or reputation in approving the August, 1986 loan. It is only now that the Bank declares their reliance on Mr. Cordek's personal assets. Furthermore, the Bank's actions fail to validate their claim of reliance on CORDEK's individual assets. The Bank failed to: (1) timely perfect its liens; (2) perform an adequate title search; or (3) conduct a sufficient credit investigation of Mr. Cordek. The Bank's failure to take these actions is inconsistent with their alleged dependence upon Mr. Cordek's assets. Thus, the Bank will not suffer severe prejudice from a consolidation order since there is no showing it relied on CORDEK's assets in consenting to the loan.
>
> However, even if the Bank were deemed to be prejudiced by the consolidation, the Corporate Creditors appear to be similarly situated, making it equitable to treat them the same. The advantages of consolidation outweigh any prejudice the Bank might experience.

***In re Munford, Inc.***— *In re Munford, Inc.*, 115 B.R. 390 (Bankr.N.D.Ga.1990), was not a case where the court ultimately approved substantive consolidation, but rather where the court indicated that an adversary complaint sufficiently stated a case for substantive consolidation, which should be heard on the merits. In the decision, Judge W. Homer Drake gave an excellent analysis of the case law. Munford operated about 500 convenience stores in the south. It licensed the right to operate the stores under the name of "Majik Market" to TOC Retail, Inc. Majik Market Management Corporation (MMMC) was created to manage the operations of both Munford and TOC. Munford and TOC were being acquired in a complicated financial transaction by the Panfida Group through intermediaries. MMMC, with the approval of the bank underwriting the financing, was to provide management services to Munford and TOC.

The complaint for consolidation alleged that by virtue of the closing process, which was still under way at the time of the bankruptcy, TOC and MMMC had become entangled in the business operations of Munford. They shared telephone systems, inventory acquisitions, fleet leasing, advertising, computer systems, and MMMC really operated Munford and TOC as a combined entity. All the business decisions were made on the

basis of TOC and Munford collectively. The insurance for the companies was combined. Funds were transferred back and forth between the companies in a manner that had little relationship to the actual benefit or burdens of the respective parties.

Munford contended that the business functions of the several companies could not be separated without physical division of the operations, records, and personnel, and it would result in an economic loss. Finally, Munford claimed he could not prepare, with any degree of competence, financial statements which would be necessary for a successful reorganization unless the businesses, Munford, TOC and MMMC, were substantively consolidated. In denying the motion to dismiss, the court noted that consolidation need not be based only on the "instrumentality" theory. It could be based on a finding that it would be more equitable under the circumstances of the particular case. *Munford* at 394:

> Munford's theory of recovery is distinct from the consolidation available under the "instrumentality" theory. As will be discussed in more detail below, substantive consolidation may be based on a finding that it would be more equitable to all of the parties to allow consolidation under the circumstances of the case, *In re Tureaud,* 59 B.R. 973, 975–76 (N.D.Okl.1986); *In re Baker & Getty Fin. Serv. Inc.,* 78 B.R. 139, 142 (Bankr.N.D.Ohio 1987); *In re Snider Bros., Inc.,* 18 B.R. 230, 234 (Bankr. D.Mass.1982), by showing that the affairs of the entities are inextricably intertwined or that creditors dealt with them as a single economic unit, and does not require a finding of fraud or intent to hinder or delay creditors.

The defendants also challenged the court's authority to consolidate the debtor's assets with those of a non-debtor. The defendants questioned the use of 11 U.S.C.A. § 105(a), the statute defining the court's general equitable powers, and suggested that 11 U.S.C.A. § 303 was the appropriate manner to bring about the results sought. The court rejected these arguments. *Munford* at 396–398. Notwithstanding case law in other areas indicating that a bankruptcy court's equitable

powers cannot be expanded under § 105(a) to create a right where none is provided for or implied in the bankruptcy code, the court cited the long history of substantive consolidation under equitable powers. The court found that substantive consolidation was ingrained in the fabric of bankruptcy law, beginning with *Sampsell v. Imperial Paper Corp.* and *Soviero v. Franklin National Bank.* It also found that substantive consolidation is a different process than that sought by § 303, and substantive consolidation does not circumvent the requirements of § 303.

***In re United Stairs Corp.***— In *In re United Stairs Corp.,* 176 B.R. 359 (Bankr. D.N.J.1995), the chapter 7 trustee and First Fidelity Bank filed an adversary proceeding against several affiliated non-debtor corporations as well as their principals.

Before bankruptcy, First Fidelity had sued United Stairs for defaulting on several million dollars in loans. First Fidelity was aggressively pursuing the litigation and, after receiving a default judgment, sought to restrain certain transfers by United Stairs to Excel Cabinet Corporation and Spiral Leasing Corporation, corporations owned ostensibly by the daughter of Louis Manzo (the principal of United Stairs) and his sister respectively. Transfers of equipment had been made to these corporations for nominal amounts. Before the property could be recovered, however, United Stairs filed bankruptcy.

The court found authority under 11 U.S.C.A. § 105(a) to substantively consolidate a non-debtor entity with a debtor under the appropriate circumstances. The court said, *Id.* at 368–69:

> While many consolidation cases involve the consolidation of entities already in bankruptcy, it is accepted that a non-debtor entity may be consolidated with a debtor under appropriate circumstances. *Sampsell v. Imperial Paper & Color Corp.,* 313 U.S. 215, 61 S.Ct. 904, 85 L.Ed. 1293 (1941); see also *In re 1438 Meridian Place, N.W., Inc.,* 15 B.R. 89 (Bankr. D.D.C.1981); and *In re Crabtree,* 39 B.R. 718 (Bankr.E.D.Tenn.1984). In *Sampsell* the Supreme Court found that substantive consolidation of a non-debtor corporation

with the individual bankrupt's estate was proper where the transfer of property to the non-debtor corporation was not in good faith but was made for the purpose of placing it beyond the reach of the original debtor's creditors, and where the effect of the transfers was to hinder, delay or defraud the individual's creditors. Id. 313 U.S. at 218–19, 61 S.Ct. at 906–07; see also Patrick C. Sargent, *Bankruptcy Remote Finance Subsidiaries: The Substantive Consolidation Issue*, 44 Bus.Law 1223, 1233–36 (1989) (discussing the consolidation of debtor subsidiaries).

Consolidation, of course, is a power that should be used sparingly. *Snider Bros.*, 18 B.R. at 234. This power is not an "instrument of procedural convenience, but a measure vitally affecting substantive rights." Id. See *Matter of Flora Mir Candy Corp.*, 432 F.2d 1060, 1062 (2nd Cir.1970); *Chemical Bank New York Trust Co. v. Kheel*, 369 F.2d 845, 847 (2nd Cir.1966). Substantive consolidation should be considered with extreme caution and granted only in extraordinary situations. *In re Lease–A–Fleet, Inc. v. Robins Le–Cocq, Inc.*, 141 B.R. 869, 872–73 (Bankr.E.D.Pa.1992).

While this court is mindful of the seriousness of the remedy of consolidation, this is a case where extraordinary circumstances exist and an examination of the equities requires extension and substantive consolidation. Where the debtor and non-debtor entities are alter egos of each other extraordinary circumstances are present. *Lease–A–Fleet*, 141 B.R. at 872–73. In this case, no one but Louis Manzo, acting as president of United Stairs, had any knowledge of the operations of the various businesses. Manzo treated each of them as an instrumentality; using raw materials, employees, physical space, telephone and even stationary as needed regardless of the corporate niceties. Similar to the debtor's actions in Sampsell, the transfers of property to Spiral and Excel were not in good faith but were made for the purpose of placing United Stairs' assets beyond the reach of its creditors. *Sampsell*, 313 U.S. at 218–19, 61 S.Ct. at 906–07.

After discussing the criteria for determining whether a case should be substantively consolidated and the various tests that courts have fashioned to deal with the issue, the court said that, *Id.* at 369:

... while such tests may be helpful in some analyses this court adopts the ultimate test of balancing of the equities. In doing so, the court must weigh the economic prejudice of continued debtor separateness against the economic prejudice of substantive consolidation. *In re Cooper*, 147 B.R. 678, 682 (Bankr.D.N.J.1992); *In re Snider Bros., Inc.*, 18 B.R. 230, 234 (Bankr.D.Mass.1982). This determination must be sui generis. *In re Augie/Restivo*, 84 B.R. at 321, quoting 5 *Collier on Bankruptcy*, ¶ 1100.06, p. 1100–33 (15th Ed.1985).

The court had no problem in finding that the trustee and First Fidelity had established a right to substantively consolidate the non-debtor corporations with the debtor.

*Matter of New Center Hospital*— The summary judgment approving substantive consolidation in an adversary proceeding was affirmed in part in *Matter of New Center Hospital*, 187 B.R. 560 (E.D.Mich.1995). The consolidation was sought by the Internal Revenue Service and the Department of Housing and Urban Development against debtor hospital and a number of alleged *alter egos*. The bankruptcy court granted summary judgment on the basis that the medical corporations and hospital acted as *alter egos* of one another and that substantive consolidation was warranted. It ordered the consolidation *nunc pro tunc* to the date of the appointment of a chapter 11 trustee. The district court affirmed the consolidation, but remanded the *nunc pro tunc* portion.

Although the bankruptcy court relied on Michigan case law to determine if an *alter ego* situation existed under the facts, the substantive consolidation was not ordered under the state *alter ego* policy, but under the bankruptcy court's equitable powers under 11 U.S.C.A. § 105(a). *Id.* at 567.

Having found that the debtors and non-debtor corporations were *alter egos*, the court found that the bankruptcy court was correct in determining that the affairs of the

debtors and non-debtors were so entangled as to warrant substantive consolidation. The bankruptcy court found under the *Augie/Restivo* test that there was sufficient evidence of creditors dealing with the entities as a unit and sufficient entanglement to make the business affairs of the debtors and non-debtor corporations "inextricably intertwined that untangling the affairs would be either impossible or too costly to the estate." *Id.* at 569. The district court found that under an *Auto–Train* analysis "the facts also support a finding of substantial identity-the *alter ego* issue." The court also determined that because the United States was the largest creditor, the benefits of consolidation outweighed the detriments.

On the issue of the appropriate date to fix the consolidation of the non-debtors, the district court reversed. It did this on the basis principally of *Auto–Train*, because there had been insufficient inquiry into the possible harm to creditors who might have dealt separately with the non-debtor corporations as of a certain date.

***In re Creditors Service Corp.***— In *In re Creditors Service Corp.*, 195 B.R. 680 (Bankr. S.D.Ohio 1996), the court substantively consolidated a chapter 7 corporate debtor with non-debtor entities and with an individual owning all of the debtor's shares. The debtor was in the collection business. It had allowed the bar date on various collections for Consolidated Freightways of Delaware, Inc. to pass. Consolidated Freightways obtained a large judgment against the debtor prior to the bankruptcy, but the bankruptcy was filed before collection of the Consolidated Freightways' judgment could proceed.

The business, at the time of the bankruptcy, was run by Kathleen Cooley. She was the sole shareholder of the debtor. She was also the principal in a number of other collection businesses, most of which operated as corporations.

The court gave a detailed analysis of the intricate involvement of all the parties and concluded that: (a) most of the entities operated out of the same location at one time; (b) the debtor bought insurance for all the entities; (c) some of the employees performed work for one entity and were paid by another; (d) some of the non-debtor entities retained debtor's funds postpetition; (e) there were undocumented loans made by principals to various of the entities and by the entities among themselves; (f) payment of Ms. Cooley's salary for services to one of the non-debtor corporations was made by the debtor for a "management fee;" (g) one of the non-debtors sold the debtor's furniture postpetition; (h) there was no rational allocation of the rent paid by the debtor and non-debtor entities to the non-debtor which owned the real estate; (i) some of the non-debtors failed to pay any rent at all; (j) significant salaries were received by officers in the years just before the filing, with transfers back of some of those sums in the form of loans without the benefit of any documentation; and (k) the debtor made payments on Ms. Cooley's personal credit cards.

The court acknowledged that there was no specific statutory authority for a bankruptcy court to substantively consolidate entities, but noted that many courts had found a broad equitable power to do so under 11 U.S.C.A. § 105(a), citing *Munford, Tureaud, and New Center Hospital,* 179 B.R. 848, 853 (Bankr.E.D.Mich.1994), *affd. in part, rev'd in part,* 187 B.R. 560 (E.D.Mich.1995). While the remedy of substantive consolidation is similar to piercing the corporate veil, it is not the same. *Creditors Service,* at 689:

> Practically, substantive consolidation is similar to the state law remedy of piercing the corporate veil based on a finding that the entities are alter egos. See J. Stephen Gilbert, *Note, Substantive Consolidation in Bankruptcy: A Primer,* 43 Vand.L.Rev. 207 (1986); *In re Cooper,* 147 B.R. at 683–84. Piercing the corporate veil, however, is not a prerequisite to the utilization of the bankruptcy law remedy of substantive consolidation. *In re Munford,* 115 B.R. at 394, citing *In re Tureaud,* 59 B.R. at 975–76; *In re Snider, Inc.,* 18 B.R. 230, 234 (Bankr.D.Mass.1982). The bankruptcy remedy of substantive consolidation ensures the equitable distribution of property to all creditors, while on the other hand, piercing the corporate veil is a limited merger for the benefit of a particular creditor. See *In re Cooper,* 147 B.R. at 683–84.

The court also noted, as almost all other courts have, that the remedy of substantive consolidation is extreme and should be exercised with great care. It involves consolidating the assets and liabilities of separate entities into one. This should not be a mere instrument of convenience, but only done where considered absolutely necessary and where the benefits outweigh any injury to affected creditors. *Id.* at 689.

*In re Alpha & Omega Realty, Inc.*— The first case denying substantive consolidation of non-debtors is *In re Alpha & Omega Realty, Inc.*, 36 B.R. 416 (Bankr.D.Idaho 1984). In this terse opinion, the court questioned whether 11 U.S.C.A. § 105(a) could be used as authority for substantive consolidation of non-debtors. The court declined to follow *1438 Meridian Place, N.W., Inc.* Part of its rationale was that the Supreme Court's *Marathon Pipe Line* case indicated that the expanse of jurisdiction of the bankruptcy court envisioned by the 1978 Bankruptcy Code had been substantially diminished. The court said, *Id.* at 417:

> I also question the conclusion of that court that nondebtor parties can essentially be declared involuntary debtors through use of a "veil piercing" theory, especially when raised by motion and not through either an adversary proceeding or involuntary petition under § 303 with their attendant protections.

The trustee in *Bonham* was, of course, not in a position to bring involuntary petitions against WPI or APFC since he was not a creditor. Some opponent's of the trustee's motion to consolidate suggest he should have filed voluntary proceedings against WPI and APFC. I will discuss this in Part 4.6.

*In re DRW Property Co. 82*— A more thoughtful opinion is *In re DRW Property Co. 82*, 54 B.R. 489 (Bankr.N.D.Tex.1985). Donald R. Walker, a real estate developer, sought substantive consolidation of 85 partnerships that had filed voluntary chapter 11 cases with 109 non-debtor limited partnerships, principally for economy in proposing a plan and to obtain federal income tax advantages.

Walker was a substantial real estate investor, developer, and syndicator in the early 1980's. The 109 non-debtor partnerships each operated separate properties and were used for investment vehicles to obtain financing. There were several types of partnerships, some simple and some more complex.

Notwithstanding the rapid expansion of his business, their accounting and financial management functions lagged. The investments made by individuals were difficult to trace to a specific partnership. The funds for each project were ultimately channeled into a central cash management account, and weaker projects were supported by stronger ones.

The strongest argument for consolidation was the almost hopeless entanglement of the records of the 109 partnerships. The court noted the holding in *Chemical Bank New York Trust Co. v. Kheel,* where the interrelationships of the group were hopelessly obscured and the expense of unscrambling them would have substantially jeopardized the recovery of any funds for creditors.

Ultimately, the court found that the *Kheel* test might be applicable with respect to the accounting for the *partnership interest of the various limited partners* (i.e., the equity interest), but, although difficult, it was possible to trace the *income and expense from each project* (i.e., the creditors' interest). There were sufficient records to track the income and expense of each project, although it might cost $2 million in accounting fees to straighten out.

The court found that substantive consolidation was not warranted because it appeared that if the assets were consolidated it would be to the detriment of the creditors of those projects which were strong and could pay the creditors, and to the benefit of those which were weak and could not. Thus, the court focused on the creditors' rights as opposed to the equity holders and determined that the right to substantive consolidation was not established. Additionally, the court questioned the ability to substantively consolidate for the purpose of obtaining the tax benefit the debtor sought by the application.

In the *Bonham* case, there are no substantial assets in either WPI or APFC, and the estate will only benefit from the avoidance recoveries.

**In re R.H.N. Realty Corp.**— *In re R.H.N. Realty Corp.*, 84 B.R. 356 (Bankr.S.D.N.Y. 1988), is cited by some courts as an example of a case where a court found it had no jurisdiction to consider substantive consolidation of a non-debtor into a pending case.

R.H.N. Realty Corp. was an involuntary chapter 7 proceeding. A creditor and the trustee filed a complaint. One of the counts in the complaint, which only the creditor and not the trustee asserted, was for a declaration that the non-debtor was an *alter ego*. The creditor sought a judgment against the non-debtor for the benefit of the creditor only, and not the estate. Subsequently, the creditor moved to state a count for substantive consolidation of the estate of the non-debtor with the estate of the debtor.

Thus, the only issue was whether a motion to amend should be granted. The court acknowledged the authority of a bankruptcy court to substantively consolidate the affairs of parties when they are so intertwined as to make it impossible to administer them as separate entities. *Id.* at 358. The court indicated that substantive consolidation should be applied with great caution and particularly when *nunc pro tunc* consolidation is sought.

The grounds for denial of the motion appeared to be that insufficient "evidence" was stated for the amendment. However, the court did add the following, *Id.* at 359:

> Moreover, the order for relief has already been entered against the debtor corporation. To amend the caption so as to add Haverstraw as a co-debtor would deprive Haverstraw of the opportunity of contesting the involuntary petition, as permitted under 11 U.S.C.A. § 303(d) and (h). This procedure offends the fundamental due process requirements of the Fourteenth Amendment. See *Mullane v. Central Hanover Bank and Trust Company*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950). For this reason alone, the plaintiffs' cross-motion must be denied.

These few sentences are the only reason for denying substantive consolidation. The court did not explain how this squared with its earlier acknowledgment that substantive consolidation was an admitted part of bankruptcy jurisprudence. Nor did the court consider that there might be methods of giving notice to the creditors of the non-debtor which would accord with due process.

**In re Julien Co.**— The court in *In re Julien Co.*, 120 B.R. 930 (Bankr.W.D.Tenn. 1990), dismissed a motion for substantive consolidation made by the chapter 11 trustee on procedural grounds. The court felt that the matter should have been brought by an adversary or through another device such as an involuntary petition pursuant to 11 U.S.C.A. § 303. The facts in the opinion are rather sparse. The trustee's motion sought to amend the petition in order to identify the debtor as "Julien J. Hohenberg d/b/a The Julien Company."

The court briefly discussed, but did not analyze the factual allegations made by the chapter 11 trustee supporting an *alter ego* approach to substantive consolidation. After analyzing a number of the earlier substantive consolidation cases, the court said, *Id.* at 936–37:

> This Court does not conclude that a bankruptcy court should never order substantive consolidation or that it lacks the equitable authority to do so in an appropriate factual environment. However, the bankruptcy court should cautiously exercise that authority only when the facts demand it. In those cases discussed herein where the debtor has been consolidated with other bankruptcy debtors, the remedy or results are not offensive to this Court when the facts demonstrate that the debtors were in fact one entity or were so intertwined as to be indistinguishable and when the result is equitable for the creditors of each estate. But, this Court has great difficulty with the present facts where the corporate debtor's Trustee attempts to say that the debtor is not in fact a corporation and that therefore the non-debtor individual's assets are property of the debtor's estate. It is troublesome for the debtor to pierce its own veil and deny its corporate existence and conclude that as a result Mr. Hohenberg's assets belong to the debtor. The attempted remedy is more offensive because it is sought by

motion rather than by adversary proceeding.

The court also alluded to the fact that the trustee perhaps did not have standing to pursue the *alter ego* claim against Mr. Hohenberg, citing *Caplin v. Marine Midland Grace Trust Co. of N.Y.*, 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972), and similar cases. In making this reference, the *Julien* court failed to recognize the distinction between veil piercing as a state law doctrine versus substantive consolidation as a bankruptcy doctrine recognized by virtue of a supreme court opinion, and a number of circuit and bankruptcy courts. *See,* the discussion at Part 4.2 of this *Memorandum Decision.*

***In re Lease–A–Fleet, Inc.***— Perhaps the most articulate case to voice the concerns about consolidating a non-debtor with a debtor's case, in *In re Lease–A–Fleet, Inc.*, 141 B.R. 869 (Bankr.E.D.Pa.1992). Unfortunately, the case is colored by the judge's obvious distaste for the plaintiff. He believed the plaintiff was both over-litigious and was seeking substantive consolidation for some unspecified advantage which neither he nor any other creditor could fathom.

Nonetheless, the court went through a discussion of the criteria for substantive consolidation, *Id.* at 871–72, and a thoughtful discussion of the conceptual difficulties of consolidating a non-debtor at 872–76.

One of the conceptual problems alluded to was what type of notice was due to creditors. In that case, the court required notice to be given to all creditors of the non-debtor corporation. Additionally, substantive consolidation of non-debtors might circumvent the procedures for involuntary cases under 11 U.S.C.A. § 303.

The court also noted the difficulty in applying certain protections for debtors, or rights given to them. For example, how to apply § 362 regarding the automatic stay, or the avoiding powers under §§ 542–549.

In essence, the court points out that those courts which have allowed substantive consolidation had not fully explored the possible ramifications of the "what ifs." The court said, *Id.* at 874:

It is therefore not surprising to this court to find that placing an involuntary non-debtor consolidatee in such an unusual circumstance, betwixt and between the Bankruptcy Code, should be reserved for unusual circumstances which might justify such a conceptually-strange measure.

***In re Circle Land and Cattle Corp.***— The judge in *In re Circle Land and Cattle Corp.*, 213 B.R. 870 (Bankr.D.Kan.1997), strongly disputed that the bankruptcy court has authority under § 105(a) to consolidate the estate of a non-debtor into a debtor's pending bankruptcy case. The court first noted that the oversecured creditor who had sought the consolidation had mistaken its remedies. The creditor referred to the state corporate law of piercing a corporate veil. The court said, *Id.* at 874:

State corporate law authored the alter ego doctrine. Federal bankruptcy law conceived substantive consolidation, the doctrine of joining the estates of bankrupt entities. The two doctrines are distinguished in a well-regarded bankruptcy treatise discussing administrative and substantive consolidation, on the one hand, and piercing-the-corporate-veil jurisprudence and merger, on the other:

"Substantive consolidation should not be confused with either the corporate law concept of piercing the corporate veil or the bankruptcy law concept of *joint administration.* Unlike piercing the corporate veil, substantive consolidation does not seek to hold shareholders liable for acts of their incorporated entity. A corporate law concept closer to substantive consolidation is merger of two corporations under state law." [footnote omitted]

The *Circle Land* court also did not reflect on or explain the fact that the Supreme Court in *Sampsell* and a circuit court in *Soviero* permitted substantive consolidation of non-debtors.

The adversary complaint for substantive consolidation spelled out a number of grounds which might typically be considered in an *alter ego* argument. The opinion has a section entitled "Substantive Consolidation

Law" aligned with Headnotes 6 through 8 at pages 875–76. There, the court cites some of the older cases such as *Stone v. Eacho* and *Soviero v. Franklin National Bank of Long Island.* Then, in another section of the opinion entitled "Consolidating a Non–Debtor," the court cites a number of cases which have approved consolidation and state that they all disregard § 303's requirements. *Id.* at 876:

> Nevertheless, the bankruptcy decisions upon which Helena relies have consolidated a non-debtor with a debtor using § 105 in disregard of § 303's requirements. See *In re 1438 Meridian Place, N.W.,* 15 B.R. 89 (Bankr.D.D.C.1981); *In re Crabtree,* 39 B.R. 718 (Bankr.E.D.Tenn.1984); *In re Tureaud,* 45 B.R. 658 (Bankr.N.D.Okla. 1985); *In re Munford, Inc.,* 115 B.R. 390 (Bankr.N.D.Ga.1990); *In re Fairfield Construction Co.,* 1995 WL 434474, 1991 Bankr.LEXIS 1395 (E.D.Mich.1991); *In re New Center Hospital,* 179 B.R. 848 (Bankr. E.D.Mich.1994); *In re United Stairs Corp.,* 176 B.R. 359 (Bankr.D.N.J.1995). In effect, these courts have used § 105 as a grant of subject matter jurisdiction.

To counter these decisions, the judge cited a group of contrary cases. *Id.* at 877:

> Contrary to those decisions that permit substantive consolidation of a non-debtor with a debtor, others have refused to take jurisdiction over a non-debtor for substantive consolidation purposes. See *In re Alpha & Omega Realty, Inc.,* 36 B.R. 416 (Bankr.D.Idaho 1984); *In re DRW Property Co.* 82, 54 B.R. 489 (Bankr.N.D.Tex. 1985); *In re R.H.N. Realty Corp.,* 84 B.R. 356 (Bankr.S.D.N.Y.1988); *In re Julien Co.,* 120 B.R. 930 (Bankr.W.D.Tenn.1990); *In re Lease–A–Fleet,* 141 B.R. 869 (Bankr. E.D.Pa.1992); *In re Ira S. Davis, Inc.,* 1993 WL 384501, 1993 Bankr.LEXIS 1383 (E.D.Pa.1993); *In re Hamilton,* 186 B.R. 991 (Bankr.D.Colo.1995). These decisions question whether bankruptcy courts have subject matter jurisdiction over non-debtor corporations for purposes of substantive consolidation, and they reason that consolidation of a non-debtor is contrary to the Code limitations for involuntary bankruptcy petitions. I agree with the reasoning of these decisions.

I believe this is an over-broad reading of some of these cases. For example, *DRW Property* is not a case where the judge ruled that substantive consolidation was improper, but that it should be used very conservatively. *In re Julien* acknowledged the authority of a bankruptcy court to substantively consolidate, but questioned the procedure that had been chosen. Likewise, *In re Lease–A–Fleet,* though very skeptical about most cases qualifying for substantive consolidation of non-debtors, did not rule out the situation where there might be such a case under the right facts.

■ 4.6. *Motion is Appropriate to Determine the Substantive Consolidation Issue-* All those parties opposing substantive consolidation are *Bonham Recovery Actions (BRA )* defendants in adversary proceedings in which the trustee seeks to avoid transfers and recover payments made to the defendants by WPI, APFC, and/or Bonham. They argue that the trustee's presentation of the substantive consolidation motion as a contested matter, instead of by an adversary proceeding or voluntary petitions against WPI and APFC, is procedurally improper. *See, e.g.,* the *BRA* defendants' joinder and supplement to *Response and Objection to Trustee's Motion For Substantive Consolidation,* Docket Entry 1108, filed by Brad Ambarian for various defendants.

They cite *In re Julien Co.,* 120 B.R. 930 (Bankr.W.D.Tenn.1990) and *In re Alpha & Omega Realty Inc.,* 36 B.R. 416 (Bankr.D.Idaho 1984), discussed in Part 4.5 of this *Memorandum Decision.* In *Julien,* a chapter 11 trustee sought to bring in an individual and amend the caption to reflect this. Unlike Mr. Julien, a non-debtor who fought substantive consolidation, the Bonham trustee, WPI, and APFC do not contest consolidation. Indeed, WPI and APFC are disenfranchised corporations, without tangible assets. The only hope of recovery for the creditors of any of these three entities is from consolidation and the avoidance actions brought by the trustee.

*Alpha & Omega* is a brief decision in which the court, alluding to the reduced jurisdiction of bankruptcy courts after *Marathon Pipe Line,* said that the proper procedure was

using an 11 U.S.C.A. § 303 involuntary petition. *See, also, In re R.H.N. Realty Corp.,* 84 B.R. at 359.

In *Bonham,* the trustee was not in a position to file an involuntary petition. However, similar to the *Alpha & Omega* rationale, the objecting parties indicate that he should have filed a voluntary petition and, failing to do that, should not be allowed to substantively consolidate WPI and APFC.

The problem with this argument is that the trustee came into the case in late 1995, without any knowledge of the operation. The trustee is a certified public accountant, and immediately began a forensic investigation. Bonham, WPI, and APFC, he discovered, kept no standard accounting records to guide him, had no computer records, and the records that were available were incomplete. He met stonewalling at almost every point from RaeJean Bonham. He did not come into this case with perfect knowledge of the background, but only developed this after months of arduous investigation, including tedious analysis and inputting records into a data base.

In a case where Bonham, WPI, and APFC are *alter egos,* restricting the procedure for recovery of avoidable transfers by a requirement that the trustee file voluntary cases for WPI and APFC will work an injustice on the creditors who might otherwise receive a dividend in bankruptcy. No doubt if he had, there would be challenges to his authority to have done so, based on the uncertainty of corporate ownerships, since the corporate formalities were not observed.

More importantly, when the trustee began to accumulate sufficient knowledge to have filed a voluntary proceeding for WPI and APFC, a significant amount of time had passed since the involuntary was filed against RaeJean Bonham on December 19, 1995. The facts show that her Ponzi activities were on the decline during 1995. By being relegated to the later date of the voluntary petition, the trustee would have missed the time limit to bring fraudulent transfer actions under 11 U.S.C.A. § 548 against many of the transfers which occurred during the height of Bonham's activities.

Substantive consolidation may be sought by different parties. Sometimes the trustee or debtor-in-possession seeks it. Often, it is a creditor. The important thing, for due process purposes, is notice and an opportunity to be heard. An adversary proceeding would have been a cumbersome way to bring this issue to the court. Should the trustee have named the 600 *BRA* defendants in one large adversary? How would they have been served? With individual subpoenas or by notice? Who would have represented their interests?

In the present case, the trustee used the most effective procedure—a motion. Notice was served on all *BRA* defendants and responses were received opposing consolidation in about 200–300 of the individual adversary proceedings. The trustee, anticipating FRCivP 56(f) type motions, sought early on to make the documents of the debtor available. While this has proved to be a cumbersome task, it is not through lack of effort by the trustee to make the documents available.

This is not a one-on-one situation where the trustee seeks to bring in a non-debtor entity and the non-debtor opposes. In such a case, the matter has often been by an adversary because the logistics are simple—serve one party. Even in a case where an adversary is used, a court has seen that the rights of creditors of the non-debtor must be addressed. The court in *In re Lease–A–Fleet,* 141 B.R. 869, 873 (Bankr.E.D.Pa.1992), discussed in Part 4.5, notwithstanding the fact that an adversary had been used, required separate notice to the creditors of the non-debtor corporation. The procedure adopted by the *Bonham* trustee closely approximates the one required in *Lease–A–Fleet* to protect creditors who were not actual parties to the pending adversary proceeding.

Many of the non-debtor consolidation cases discussed in Part 4.5 of this *Memorandum Decision* were prosecuted as motions. Although it was often not an issue in some of the cases, other courts specifically held that a proceeding need not be by adversary rules or an involuntary petition. *In re 1438 Meridian Place, N.W., Inc.,* 15 B.R. at 94–95; *In re Crabtree,* 39 B.R. at 721 (motion acceptable

instead of involuntary petition). The court in *Meridian* distinguished the relief sought by substantive consolidation from the type which had to be brought under FRBP 701, the predecessor of FRBP 7001. While some aspects of consolidation may have traits akin to FRBP 7000(1) regarding the delivery of property of a trustee, or 7001(9) declaratory judgment, the relief is distinct from the relief sought in those rules.

I will overrule the objection to the motion procedure chosen by the trustee to accomplish consolidation of WPI and APFC.

 4.7. *Application of Law to Determine If WPI and APFC Should be Substantively Consolidated With the RaeJean Bonham Case*— The two key questions in this matter are: (a) should WPI and APFC, nondebtors, be consolidated with the *Bonham* estate, and if so, (b) should the effective date be the petition date for *Bonham,* or the date of the motion to consolidate? I will discuss the first question in Part 4.7 of this *Memorandum Decision,* and discuss the effective date in Part 4.8 (although this issue blurs into Part 4.7).

To answer these questions, it is important to distinguish the two types of creditors involved in this case. First, there are the creditors of the Bonham, WPI, and APFC estates whose claims will be paid something (probably less than fifty-cents on the dollar) if there are assets recovered by the trustee. I will call this type of creditor a **"Claimant."** Secondly, there are creditors of WPI, APFC, and Bonham who were paid prepetition, but are subject to avoidance claims (such as for fraudulent transfers). I will call this type of creditor a **"Target."**

Though not applicable to the *Bonham* case, other cases may have Targets, not because they are subject to avoidance actions, but because any bankruptcy recovery may be diluted by consolidation of assets with those of a financially weaker debtor. If consolidation is not granted, *nunc pro tunc,* in *Bonham,* there will be nothing to dilute.

 Most of the case law regarding substantive consolidation is an attempt to balance the rights of Claimants and Targets. Simplistically, the Claimants first must make their case for substantive consolidation (e.g., by showing why consolidation is fair or just because of the intermingling of assets, *alter ego* behavior, fraud, etc.), and then the Targets must show why consolidation, which might otherwise be appropriate, should be denied (e.g., because of a reliance on the separate entity, unfair dilution of recovery if consolidation occurs, etc.).

Some creditors of *Bonham* are both Claimants and Targets because they had not been paid in full by WPI or APFC prepetition, but had received some payments within the avoidance period. Many Targets in *Bonham* are willing to give up the right to be a Claimant because they do not want to pay the trustee in whole dollars to recover only a small percentage of the amount from the trustee in a dividend. Thus, some Claimants who are also *BRA* defendants (Targets), are willing to withdraw their proofs of claim (their right to be Claimants) to get their *BRA* adversary proceedings out of the bankruptcy court by claiming the right to jury trial to be heard in the United States District Court where they feel they will fare better at defeating the trustee's avoidance action.

Some of the Claimants are not *BRA* defendants (Targets), but are creditors who may have invested in and never received any repayment from WPI or APFC. Also included among the Claimants is Delta Air Lines with a $2,000,000 claim. These Claimants will get distributions from any avoidance recoveries made by the trustee and have every incentive to see the cases substantively consolidated, *nunc pro tunc* as of December 19, 1995. Otherwise, they stand to get nothing.

There is no question that consolidation will help, and not prejudice, a Claimant under the facts of the *Bonham* case. Conversely, Targets, unless they can raise some defense to the trustee's avoidance actions, will be harmed—they will have to pay any judgments against them to the bankruptcy trustee. Whether it is fairer to consolidate or not is what this long *Memorandum Decision* is about. Either way, there will be a lot of pain involved. There are, unfortunately, "widows and orphans" in both the Claimant and Target groups. The trustee is attempting to see

that the Claimants recover as much as possible. The Targets' goal is just the opposite.

The Claimants, represented by the trustee, have made a strong *prima facie* case for consolidation of WPI and APFC with the existing estate of RaeJean Bonham. Under almost any of the tests devised by the courts in the cases mentioned in Parts 4.3–4.5 of this *Memorandum Decision*, the Claimants (or the trustee on their behalf) can make a compelling *prima facie* case for substantive consolidation. Whether there are sufficient countervailing reasons which can be established by the Targets to deny consolidation is the subject of Part 4.8.

The reasons for consolidation are, first, the financial affairs of Bonham, WPI and APFC are hopelessly entangled. Second, the Claimants were enticed into investing in a fraudulent Ponzi scheme, and the funds were used to pay other investors (Targets) in the Ponzi scheme and to support Bonham and her family. Third, neither Bonham, WPI, nor APFC has any significant assets to cover the millions of dollars in claims, and Bonham, WPI and APFC should be treated as *alter egos* to allow a recovery to Claimants.

Some of the specific facts to show that WPI and APFC were *alter egos* of Ms. Bonham are:

- RaeJean Bonham was the sole shareholder of each corporation. She and her husband Steve were the only officers. Steve has denied an active role in the corporations. RaeJean has indicated she "is" WPI. *See*, ¶¶ 2.2.3, 2.2.4 and 2.3.2.
- Ms. Bonham observed few corporate formalities for either WPI or APFC. She had few corporate books, including minutes, stock registers, or resolutions, except perhaps those that were required by banks to open accounts. *See*, ¶¶ 2.2.5–2.2.8 and 2.3.12–2.3.17.
- Money flowed between the three entities (Bonham, WPI and APFC) freely and usually without a legitimate business purpose. On the contrary, one can infer a corrupt purpose in transferring funds between WPI and APFC, since the use of APFC seems to coincide with the Alaska securities investigation of WPI,

and it is probable that Bonham merely put up another corporate shell to operate her Ponzi scheme. *See*, ¶¶ 2.4 and 2.6 regarding the limited nature of the ticket sales business compared to the aggressive nature of the investment scheme; ¶ 2.9 regarding the Alaska Securities Investigation; ¶ 2.3 regarding the coinciding establishment of APFC; and, ¶ 2.8 regarding the various bank accounts.

- Bonham had no computer data bases of investors or other business activity. There are no standard financial accounting records, or other records which were organized in a way that the assets and liabilities of Bonham, WPI and APFC can be readily sorted out and segregated. Most of Bonham's money came from investors, whose investments were funneled through WPI or APFC. Sometimes, investors wrote their checks to WPI and were issued contracts by APFC. Sometimes contracts were rolled over from WPI to APFC and vice versa. Funds from one corporation were used to pay the investment contracts written on the names of the others. *See*, ¶ 2.2.7.
- Bonham freely used money from the investors to support a fashionable lifestyle for herself, her husband, and her children, providing for their home, vehicles, boats, education, and recreation. *See*, ¶ 2.11.
- All investors dealt directly with RaeJean Bonham, the individual. Although they indicated they only dealt with her as agent, none indicated they had any specific financial information about WPI or APFC other than the fact that it paid them and perhaps others exorbitant returns. *See*, ¶¶ 2.12.4–2.12.8

These facts show that WPI and APFC were really the *alter egos* of Ms. Bonham, or in the vernacular of the earlier cases cited in Part 4.3 of this *Memorandum Decision*, that they were the "instrumentalities" of Bonham, and the financial affairs of the three were hopelessly entangled. They also show the use of the corporations for a fraudulent pur-

pose. As such, the three should be treated as one entity and consolidated. *See, Fish v. East, Sampsell v. Imperial Paper & Color Corp., Stone v. Eacho, Soviero v. Franklin National Bank, Chemical Bank New York Trust Co. v. Kheel,* discussed in Part 4.3; *In re Vecco Construction Industries, Inc., Eastgroup Properties v. Southern Motel Assoc., Ltd.,* discussed in part 4.4; and, *In re 1438 Meridian Place, N.W., Inc., In re Crabtree, Matter of Baker & Getty Financial Services, Inc., In re Munford, Inc., In re United Stairs Corp.,* and *In re Creditors Service Corp.,* discussed in Part 4.5.

Applying the probing analysis suggested in *In re Snider Bros., Inc.,* 18 B.R. 230, 234 (Bankr.D.Mass.1982) (*see,* Part 4.4), I have compared the economic prejudice of continued separateness of WPI, APFC and Bonham to any prejudice from their consolidation. No. Claimant will be prejudiced by consolidation. The Claimants will get nothing without consolidation.

*Snider* admonishes that mere commingling of assets is not enough to justify consolidation, *Id.* at 235, but harm must be shown by the intermingling of assets, *Id.* at 238. This can be shown. Bonham promoted a fraudulent investment scheme—a Ponzi scheme. Claimants were induced to invest funds. There funds were channeled, according to some unknown whim or scheme of Bonham, between WPI and APFC. She freely used some of the funds for her own purposes while the Ponzi scheme made the WPI and APFC enterprises hopelessly insolvent. No Claimant can truly trace where his or her funds were used. Did they go to pay APFC contracts or expenses, WPI contracts or expenses, or to Bonham? Likewise, no Target can truly trace the source of the Target's prepetition payment. Were their funds received from WPI or APFC, or just funneled through these entities?

Under the *Snider* analysis, consolidation is justified. It then becomes the burden of those opposing consolidation to show that the benefits of consolidation are outweighed by the harm. *Snider* at 238. I have found in ¶¶ 2.12.4–2.12.8 that a reasonable reliance has not been established. I will discuss this

further in Part 4.8 of this *Memorandum Decision.*

Under either the *Augie/Restivo* or *Eastgroup Properties* tests discussed in Part 4.5, consolidation is justified. To reiterate the *Augie/Restivo* test, after examining the historical and more recent case law, the court said, *Id.* at 518:

> An examination of those cases, however, reveals that these considerations are merely variants on two critical factors: (i) whether creditors dealt with the entities as a single economic unit and "did not rely on their separate identity in extending credit," or (ii) whether the affairs of the debtors are so entangled that consolidation will benefit all creditors. [citations omitted]

Certainly the affairs of Bonham, WPI and APFC were hopelessly entangled. Also, Targets apparently dealt with WPI and APFC interchangeably, dealing solely through RaeJean Bonham. There was an overall pattern of shuffling of funds between WPI and APFC, and a haphazard assignment of investment contracts to either WPI or APFC at Bonham's whim. The Targets appear to have relied on the exorbitant return as opposed to any particular corporate identity. The trustee has established the right to substantive consolidation under the *Augie/Restivo* test.

The *Eastgroup* test is, *Id.* at 249:

> [T]he proponent of substantive consolidation must show that (1) there is substantial identity between the entities to be consolidated; and (2) consolidation is necessary to avoid some harm or to realize some benefit. When this showing is made, a presumption arises "that creditors have not relied solely on the credit of one of the entities involved." Once the proponent has made this prima facie case for consolidation, the burden shifts to an objecting creditor to show that (1) it has relied on the separate credit of one of the entities to be consolidated; and (2) it will be prejudiced by substantive consolidation.... Finally, if an objecting creditor has made this showing, "the court may order consolidation only if it determines that the demonstrated benefits of consolidation 'heavily'

outweigh the harm." [omitting internal and citations]

The facts I have outlined indicate that WPI and APFC were *alter egos* of Bonham. The harm to be avoided is having those Targets who were lucky enough to be paid within the avoidance period with funds, the source of which (WPI or APFC) is undeterminable, keep those funds, including the exorbitant profit, to the detriment of those Claimants who were unlucky enough not to have been paid. The benefit, is having those funds returned to the consolidated bankruptcy estates for equitable distribution to the unsecured creditors.

The question remains, should those Targets who benefitted from payments from the Ponzi scheme be protected from a *nunc pro tunc* consolidation? I will discuss this in Part 4.8.

■ 4.8. *Should the Consolidation be Nunc Pro Tunc to Original Filing Date?*— One of the most important issues in the substantive consolidation motion is the effective date. The involuntary bankruptcy against RaeJean Bonham was filed on **December 19, 1995.** The *Trustee's Motion For Order Confirming That Assets And Liabilities Of Bonham, World Plus And Atlantic Pacific Funding Corp Are Subject To Administration, For Joint Administration And For Substantive Consolidation Of Estates And To Amend Caption,* was not filed until a year later on January 22, 1997 (Docket Entry 731).

Some defendants in the *BRA* argue that the effective date for substantive consolidation should be no earlier than **January 22, 1997.**

On December 19, 1995, the date of the involuntary petition against RaeJean Bonham, her operations had been, in essence, shut down by the Alaska Division of Securities. Both WPI and APFC had been decertified by their respective states, Alaska and Nevada. During the final year of Bonham's operation, her Ponzi scheme was beginning to unwind and the rate of new investments was declining. *See,* ¶ 2.6.4.

If the effective date for the purpose of substantive consolidation for WPI and APFC

is January 22, 1997, the one-year statute of limitations under 11 U.S.C.A. § 548(a) would only cover transfers made after January 22, 1996. In other words, no fraudulent transfer under § 548 would be recoverable for payments on contracts nominally with WPI or APFC.

*In re Auto–Train Corp.*— The *BRA* defendants principally rely on *In re Auto–Train Corp.,* 810 F.2d 270 (D.C.Cir.1987). I conclude, however, even applying the *Auto–Train* test, that substantive consolidation should be effective on December 19, 1995.

The issue in *Auto–Train* was whether funds transferred by Railway Services Corporation (Railway), a wholly owned subsidiary of Auto–Train, to Midland–Ross Corporation were a preference under 11 U.S.C.A. § 547. The dispute arose out of a transaction in which Ronsco Supply Company, Inc. brokered a deal for the sale of some railroad equipment from Midland–Ross to Marine Industries, Ltd. Because Marine Industries was a Canadian company, for some reason Midland–Ross could not deal directly with Marine. Ronsco proposed that Railway be used as an intermediary.

Ronsco, as Marine's agent, submitted a purchase order for the railroad equipment to Railway. Railway, in turn, submitted its own purchase order to Midland–Ross, the manufacturer.

The railroad equipment was shipped directly to Marine in Canada. Marine transferred about $500,000 to Railway. This included the purchase price and shipping charges totaling about $495,000, plus a $5,000 commission for Railway. Railway transferred the funds to Midland–Ross, less the $5,000 commission, over the period of June 11, 1980, through July 15, 1980.

On September 8, 1980, Auto–Train filed a voluntary chapter 11. On November 10, 1980, the chapter 11 trustee filed a motion to amend the caption of the Auto–Train petition and add Railway as a named party. The bankruptcy court conducted a hearing on November 21, 1980, and ordered the substantive consolidation of Railway into the Auto–Train estate effective as of September 8,

1980, the date of the Auto–Train voluntary petition.

The trustee then sought to avoid the transfer under § 547 of the Bankruptcy Code as preferential. Among the defenses, Midland–Ross claimed that the court had no authority to order a *nunc pro tunc* consolidation. The bankruptcy court held that *nunc pro tunc* consolidation was appropriate, and that issue was eventually appealed to the Circuit Court for the District of Columbia.

The trustee argued that *nunc pro tunc* consolidation reflected the facts as they really existed, that Railway had no existence separate from Auto–Train. The issue of substantive consolidation was not contested by Midland–Ross, only its *nunc pro tunc* application. The D.C. Circuit Court said that the criteria for determining whether to substantively consolidate were not precisely the same as those for determining the effective date of the consolidation.

Focusing first on whether or not a bankruptcy court should order consolidation, and not what the appropriate effective date should be, the court said, *Id.* at 276:

> Before ordering consolidation, a court must conduct a searching inquiry to ensure that consolidation yields benefits offsetting the harm it inflicts on objecting parties. *See, e.g., In re Snider Bros., Inc.,* 18 B.R. 230, 237–38 (Bankr.D.Mass.1982). The proponent must show not only a substantial identity between the entities to be consolidated, but also that consolidation is necessary to avoid some harm or to realize some benefit. *Id.; see also Flora Mir Candy Corp. v. R.S. Dickson & Co.,* 432 F.2d at 1063; *Chemical Bank New York Trust Co. v. Kheel,* 369 F.2d at 847. At this point, a creditor may object on the grounds that it relied on the separate credit of one of the entities and that it will be prejudiced by the consolidation. *See Chemical Bank New York Trust Co. v. Kheel,* 369 F.2d at 848 (Friendly, J., concurring). If a creditor makes such a showing, the court may order consolidation only if it determines that the demonstrated benefits of consolidation "heavily" outweigh the harm. *In re Continental Vending Ma-*

*chine Corp.,* 517 F.2d at 1001. [internal and end citations omitted]

■ The court found that there was an additional and slightly different balancing process before a court could order *nunc pro tunc* consolidation. This is because a *nunc pro tunc* order would subject certain transferees to avoidances which might have lapsed if a later date for consolidation were fixed. *Id.* at 276. An important factor in determining the appropriate date is a transferee's reliance on an entity's apparent separateness. Otherwise, in any group of affiliated corporations, "a sign of weakness in any member of a family of corporations would lead creditors to descend on each member, strong or weak, to claim their pound of flesh." *Id.* at 277.

A rule automatically adopting a *nunc pro tunc* date would make creditors reluctant to deal with financially troubled companies. It would also hinder the ability of sound companies to help their weaker affiliates out of a predicament. The court announced the following test, *Id.* at 277:

> In light of these considerations, a court should enter a consolidation order nunc pro tunc only when it is satisfied that the use of nunc pro tunc yields benefits greater than the harm it inflicts. This inquiry will closely parallel that conducted with respect to consolidation. Because the consolidation proceeding will already have established a substantial identity between the entities to be consolidated, this inquiry begins with the proponent of nunc pro tunc making a showing that nunc pro tunc is necessary to achieve some benefit or avoid some harm. Following this showing, a potential preference holder may challenge the nunc pro tunc entry of the consolidation order by establishing that it relied on the separate credit of one of the entities to be consolidated and that it will be harmed by the shift in filing dates. If a potential preference holder meets this burden, the court must then determine whether the benefits of nunc pro tunc outweigh its detriments. [footnote omitted]

The court held that Railway was a legitimate corporation, and notwithstanding the fact that it had acted as a middleman in the

Midland–Ross and Marine transaction, Midland–Ross was justified in relying, and had relied, on Railway's separate existence. Railway dealt with the public as an entity separate from Auto–Train. Midland–Ross had even extended credit to Railway after Auto–Train filed its bankruptcy. Railway had also filed an S–1 registration statement with the SEC, indicating its assets, liabilities, and operations were separate from Auto–Train's. Thus, the order of a *nunc pro tunc* consolidation was reversed, and Midland–Ross's payment to Railway was not within the 90-day preference period.

***Baker & Getty Financial Services, Inc.***— Refusing to follow *Auto–Train,* the 6th Circuit in *Baker & Getty Financial Services, Inc.,* 974 F.2d 712, 721 (6th Cir.1992), found that the distinction between whether a case should be substantively consolidated or not to begin with, was so close to the test proposed by *Auto–Train* to determine the effective date that adopting this distinction would not be wise. It permitted a consolidation effective as of the original petition date. This case involved the same facts discussed in *Matter of Baker & Getty Financial Services, Inc.,* 78 B.R. 139 (Bankr.N.D.Ohio 1987), discussed in Part 4.5.

***Matter of Evans Temple Church***— *Baker & Getty Financial Services, Inc.* relied on the reasoning of *Matter of Evans Temple Church of God In Christ and Community Center,* 55 B.R. 976 (Bankr.N.D.Ohio 1986).

In *Evans,* a *pro se* debtor, Evans, had filed an individual case on February 23, 1984. He filed an amended petition, improperly joining himself and a corporate debtor, Evans Temple Church. Later still, a proper corporate case was filed for Evans Temple Church. The individual case and corporate case were ultimately substantively consolidated.

A prepetition transfer by the corporate debtor was within the 90-day preference period if the date of the earlier individual petition date was used. On the other hand, the proper corporate filing was well after the preference period had expired. The defendant in the preference action had received notice in both cases.

Thus, the court had the issue before it which exists in the *Bonham* case, about whether the date of original filing should be used to determine if a transfer was made within the proscribed avoidance period (e.g., one year for a § 548 fraudulent transfer).

The court found it would be appropriate to use the date of the original filing, stating, *Id.* at 982–83:

> We have found no authority on the issue of whether a debtor who files a petition for relief under the Bankruptcy Code subsequent to the filing by an affiliate may avail itself of the earlier date for purposes of the preference provisions when the cases are later substantively consolidated. So far as we can tell, no decision on this issue has ever been reported. However, an analysis of the purposes behind the doctrine of substantive consolidation and of the preference provisions leads us to conclude that the latter-filing debtor may avail itself of the earlier filing date.

> If the reasons for substantively consolidating two cases filed under the Code is to protect the unsecured creditors of both debtors where the assets and liabilities of the debtors are so intermingled as to make them substantially the same, and if the purpose of the preference provisions is to assure equality of distribution among all creditors, then it logically follows that where two cases are substantively consolidated upon a determination by the Court that the assets and liabilities of each debtor are not clearly separable, the preference provisions require us to treat the creditors of both debtors in substantially the same manner. In order for us to do so, we must assign a like filing date to both Debtors for purposes of the preference provisions. We hold that the Church may avail itself of the February 23, 1984, filing date for purposes of determining whether the payment to Carnegie Body constituted a preference under Section 547.

> We believe our conclusion to lie within the spirit and purposes of the Bankruptcy Code. Moreover, we do not believe our conclusion to be manifestly unfair to Carnegie or Associates. When Evans filed his first individual pro se petition on February

23, 1984, both Carnegie and Associates were listed as creditors. Neither Carnegie nor Associates denied that it was a creditor of Evans individually. In the pleadings, Carnegie refers to all actions taken by Debtors as undertaken by "Reverend Willie Evans, II, and/or Evans Temple Church of God in Christ and Community Center, Inc." If the parties herein cannot attribute actions to the separate Debtors, it seems to us that the only fair and reasonable conclusion is that Evans and the Church are substantially the same Debtor and that the Church must be permitted to avail itself of the February 23, 1984, filing date. Only by doing so will all creditors be protected.

These facts are analogous to the reality of Bonham's Ponzi operations. The creditors dealt principally with her, and she arbitrarily assigned WPI or APFC to the investment contract.

***In re Kroh Brothers Development Co.***— In *In re Kroh Brothers Development Co.*, 117 B.R. 499 (W.D.Mo.1989), the court affirmed a decision by the bankruptcy court which, after applying the *Auto–Train* test, nonetheless found that substantive consolidation *nunc pro tunc* was approved. The court said, *Id.* at 502:

> Nunc pro tunc consolidation would make it possible for a trustee to pursue an action under § § 547 and 548, so the first requirement [of the *Auto–Train* test], benefit to the estate, is satisfied.

The *Kroh* court then considered whether the objecting party had relied on the independent credit of a non-debtor entity which was later consolidated without objection. If the date of the *nunc pro tunc* application were used, the payment to the objecting creditor would have been within the preference period. If the later date, when substantive consolidation was granted, were used, the payment would have been safe from the avoidance action.

The bankruptcy court found that the original debtor, and the non-debtor who was consolidated at a later date, had a practice of commingling their bank accounts. They had virtually no independent existence from one another. The subsequently added non-debtor had no employees, office, or separate bank account. It derived all its income from dealings with the original debtor. No evidence was offered by the objecting creditor that he or she had relied on the credit of the subsequently added non-debtor.

In the *Bonham* case, the *BRA* defendants are hard put to say that they relied on WPI or APFC, and not Bonham. This was a key person operation, and all investments were handled by Bonham personally. Funds were indiscriminately transferred back and forth between WPI and APFC. Creditors who sent the check in might use WPI's name as payee only to have it endorsed over to APFC at Bonham's whim. This whim apparently was guided in part by her hope of avoiding state securities regulations.

Investors who did have a contract with one entity, e.g., WPI, were often paid by the other, APFC. Even under the *Auto–Train* test, there was no realistic reliance solely on the credit of either WPI or APFC. Since those entities are *alter egos* of RaeJean Bonham, the effective date of the substantive consolidation should be the date of the involuntary proceeding, December 19, 1995.

The clients of attorneys George Goerig, John Burns, Michael MacDonald, Bruce Davison, Brad Ambarian, and Rebecca Copeland filed boiler-plate declarations asserting a reliance, but giving no details. Therefore, I credit them with little weight. *See,* ¶¶ 2.12.4–2.12.8.

There were two businesses run by Bonham: a ticket sales business that did no better than break even (*see,* ¶ 2.4), and an investment business which turned over large sums of money (*see,* ¶ 2.6). If the facts were that the *BRA* defendants in fact invested funds that were used in the ticket sales business and had been paid by the ticket sale business, they would have a good argument for avoiding a *nunc pro tunc* consolidation. In reality, however, their investment was, knowingly or unknowingly, in an illegal Ponzi scheme. If they were not paid by a legitimate ticket sales business, but by the pyramid of funds from subsequent Ponzi scheme investors, then their situation is different than Ronsco in *Auto–Train.* There is fairness in treating the Targets like the Claimants, and allowing the equitable distribution features of the Bankruptcy Code to operate

for both Claimants and Targets rather than have the Claimants bear the entire burden of Bonham's Ponzi scheme.

I conclude that consolidation of WPI and APFC should be effective as of December 19, 1995.

5. *CONCLUSION*— Substantive consolidation of WPI and APFC with the Bonham estate will be ordered effective as of December 19, 1995.

The court will enter a separate order to accomplish this, but first seek the advice of the parties at the next *BRA* status conference regarding the form of the order and such issues as to whether additional notices are necessary to the creditors of WPI and APFC, and what the form should be.

## APPENDIX A—OUTLINE OF PLEADINGS REGARDING TRUSTEE'S MOTION FOR SUBSTANTIVE CONSOLIDATION

On January 22, 1997, Cabot Christianson, special counsel for the trustee, filed a *Trustee's Motion For Order Confirming That Assets And Liabilities Of Bonham, World Plus And Atlantic Pacific Funding Corp Are Subject To Administration, For Joint Administration And For Substantive Consolidation Of Estates And To Amend Caption* (Docket Entry 731) [*"Motion to Consolidate"*]. This motion is supported in part by the *Affidavit of Larry D. Compton* (Docket Entry 732), Exhibits to the *Affidavit,* Nos. 1 through 82 (Docket Entry 733), and the *Supplemental Affidavit Of Larry D. Compton* with attached Exhibits 84 through 100 (Docket Entry 1281). The trustee's motion was vigorously opposed by *pro se* creditors/investors, as well as members of the Joint Defense Committee (JDC). The trustee supplemented his motion and responded to the oppositions. The table listed below sets forth all the relevant pleadings regarding the trustee's motion.

| DE # | FILED | TITLE | FILED BY |
|---|---|---|---|
| 731 | 01/22/97 | Trustee's Motion For Order Confirming That Assets And Liabilities Of Bonham, World Plus And Atlantic Pacific Funding Corp Are Subject To Administration, For Joint Administration And For Substantive Consolidation Of Estates And To Amend Caption [*"Motion to Consolidate"*] | Cabot Christianson for Trustee |
| 732 | 01/22/97 | Affidavit Of Larry D. Compton | Larry Compton, Trustee |
| 733 | 01/22/97 | Exhibits To *Motion to Consolidate* | Cabot Christianson for Trustee |
| 746 | 01/24/97 | Opposition To *Motion To Consolidate* | William Satterberg |
| 895 | 02/21/97 | Opposition To *Motion To Consolidate* | William Satterberg |
| 905 | 03/03/97 | Opposition To *Motion To Consolidate* | Robert Darling, *Pro Se* |
| 906 | 03/03/97 | Memorandum In Support Of Opposition To *Motion To Consolidate.* | Robert Darling, *Pro Se* |
| 914 | 03/10/97 | Response To Opposition To *Motion To Consolidate* | Kenneth & Donna Wooten, *Pro Se* |
| 1032 | 03/17/97 | Joint Defense Counsel's Procedural Objection To *Motion To Consolidate* | John Burns |
| 1051 | 03/24/97 | Response And Objection To *Motion To Consolidate* | Randy Haines for Carter, Dunlap, et al |
| 1105 | 04/21/97 | Supplemental Memorandum In Opposition To *Motion To Consolidate* Re: Alter Ego Issues | Randy Haines for Carter, Dunlap, et al |
| 1107 | 04/21/97 | Appendix Of Supplemental Authorities Re: Opposition To *Motion To Consolidate* | Ronald Goss |
| 1108 | 04/21/97 | Joinder And Supplement To Response And Objection To *Motion To Consolidate* | Brad Ambarian |

| DE # | FILED | TITLE | FILED BY |
|------|-------|-------|----------|
| 1150 | 05/05/97 | Trustee's Reply To Procedural Objections To *Motion To Consolidate* [Re: DE# 1032, 1051, 1105, & 1108] | David Bundy for Trustee |
| 1151 | 05/05/97 | Trustee's Reply To Objections To *Motion To Consolidate* [Re: DE# 746, 895, 905, 914, 1032, 1051, 1105, 1107, & 1108] | David Bundy for Trustee |
| 1170 | 05/16/97 | Delta Air Lines, Inc.'s Partial Joinder In *Motion To Consolidate* | Jon Dawson for Delta Air Lines |
| 1177 | 05/21/97 | Trustee's Supplemental Memorandum Re: *Motion To Consolidate* | Cabot Christianson for Trustee |
| 1178 | 05/21/97 | Statement Of Genuine Issues Of Material Fact Re: *Motion To Consolidate* | Brad Ambarian |
| 1281 | 05/23/97 | Supplemental Affidavit Of Larry D. Compton | Cabot Christianson for Trustee |
| 1304 | 05/28/97 | Statement Of Uncontested Facts | Cabot Christianson fo r Trustee |
| 1319 | 06/06/97 | Trustee's Proposed Findings of Fact and Conclusions of Law | Gary Spraker for Trustee |
| 1328 | 06/20/97 | Objections To Trustee's Proposed Findings of Fact | Brad Ambarian |
| 1329 | 06/20/97 | Defendants' Proposed Findings of Fact and Conclusions of Law Re: *Motion To Consolidate* | Lewis & Roca George Goerig |
| 1342 | 07/03/97 | Trustee's Reply To Objection To Proposed Findings Of Fact And Objection To Defendants' Proposed Findings And Conclusions Re: *Motion To Consolidate* | Cabot Christianson for Trustee |